## HOPE *v.* PELZER ET AL.

No. 01–309.   Argued April 17, 2002—Decided June 27, 2002

STEVENS, J., delivered the opinion of the Court, in which O'CONNOR, KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined. THOMAS, J., filed a dissenting opinion, in which REHNQUIST, C. J., and SCALIA, J., joined, *post*, p. 748.

*Craig T. Jones* argued the cause for petitioner. With him on the brief were *James Mendelsohn, J. Richard Cohen,* and *Rhonda Brownstein.*

*Austin C. Schlick* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Olson, Assistant Attorneys General McCallum* and *Boyd, Deputy Solicitor General Clement, Barbara L. Herwig,* and *Richard A. Olderman.*

*Nathan A. Forrester,* Solicitor General of Alabama, argued the cause for respondents. With him on the brief were *Bill Pryor,* Attorney General, *Alyce S. Robertson,* Deputy Solicitor General, and *Margaret Fleming* and *Ellen Leonard-Thomas,* Assistant Attorneys General.

*Gene C. Schaerr* argued the cause for the State of Missouri et al. as *amici curiae* urging affirmance. With him on the brief were *Jeremiah W. Nixon,* Attorney General of Missouri, and *James R. Layton,* State Solicitor, *Robert H. Kono,* Acting Attorney General of Guam, and *Carter G. Phillips,* joined by the Attorneys General for their respective States as follows: *Richard Blumenthal* of Connecticut, *Earl I. Anzai* of Hawaii, *Steve Carter* of Indiana, *Richard P. Ieyoub* of Louisiana, *Mike Moore* of Mississippi, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *D. Mi-*

*chael Fisher* of Pennsylvania, *Sheldon Whitehouse* of Rhode Island, *Mark L. Shurtleff* of Utah, and *Darrell V. McGraw, Jr.,* of West Virginia.*

JUSTICE STEVENS delivered the opinion of the Court.

The Court of Appeals for the Eleventh Circuit concluded that petitioner Larry Hope, a former prison inmate at the Limestone Prison in Alabama, was subjected to cruel and unusual punishment when prison guards twice handcuffed him to a hitching post to sanction him for disruptive conduct. Because that conclusion was not supported by earlier cases with "materially similar" facts, the court held that the respondents were entitled to qualified immunity, and therefore affirmed summary judgment in their favor. We granted certiorari to determine whether the Court of Appeals' qualified immunity holding comports with our decision in *United States* v. *Lanier,* 520 U. S. 259 (1997).

I

In 1995, Alabama was the only State that followed the practice of chaining inmates to one another in work squads. It was also the only State that handcuffed prisoners to "hitching posts" if they either refused to work or otherwise disrupted work squads.[1]   Hope was handcuffed to a hitching

---

*Mark R. Brown, James K. Green,* and *Steven R. Shapiro* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging reversal.

[1] In its review of the summary judgment, the Court of Appeals viewed the facts in the light most favorable to Hope, the nonmoving party. 240 F. 3d 975, 977 (CA11 2001) (case below). We do the same. *Saucier* v. *Katz,* 533 U. S. 194, 201 (2001). The Court of Appeals also referenced facts established in *Austin* v. *Hopper,* 15 F. Supp. 2d 1210 (MD Ala. 1998). 240 F. 3d, at 978, n. 6. This was appropriate because *Austin* is a class-action suit brought by Alabama prisoners, including Hope, and the District Court opinion in that case discusses Hope's allegations at some length. 15 F. Supp. 2d, at 1247–1248. In their summary judgment papers, both Hope and respondents referenced the findings in *Austin,* and thus those

post on two occasions. On May 11, 1995, while Hope was working in a chain gang near an interstate highway, he got into an argument with another inmate. Both men were taken back to the Limestone prison and handcuffed to a hitching post. Hope was released two hours later, after the guard captain determined that the altercation had been caused by the other inmate. During his two hours on the post, Hope was offered drinking water and a bathroom break every 15 minutes, and his responses to these offers were recorded on an activity log. Because he was only slightly taller than the hitching post, his arms were above shoulder height and grew tired from being handcuffed so high. Whenever he tried moving his arms to improve his circulation, the handcuffs cut into his wrists, causing pain and discomfort.

On June 7, 1995, Hope was punished more severely. He took a nap during the morning bus ride to the chain gang's worksite, and when it arrived he was less than prompt in responding to an order to get off the bus. An exchange of vulgar remarks led to a wrestling match with a guard. Four other guards intervened, subdued Hope, handcuffed him, placed him in leg irons and transported him back to the prison where he was put on the hitching post. The guards made him take off his shirt, and he remained shirtless all

---

findings are part of the record in this case. See, *e. g.*, Plaintiff's Preliminary Response to Defendants' Special Report, Record 30; Defendants' Response to Court Order, App. 61. Accordingly, for purposes of our review of the grant of summary judgment, the *Austin* findings may also be assumed true, and we reference them when appropriate.

As *Austin* explained, the hitching post is a horizontal bar "'made of sturdy, nonflexible material,'" placed between 45 and 57 inches from the ground. Inmates are handcuffed to the hitching post in a standing position and remain standing the entire time they are placed on the post. Most inmates are shackled to the hitching post with their two hands relatively close together and at face level. 15 F. Supp. 2d, at 1241–1242.

day while the sun burned his skin.[2]  He remained attached to the post for approximately seven hours.  During this 7-hour period, he was given water only once or twice and was given no bathroom breaks.[3]  At one point, a guard taunted Hope about his thirst.  According to Hope's affidavit: "[The guard] first gave water to some dogs, then brought the water cooler closer to me, removed its lid, and kicked the cooler over, spilling the water onto the ground."  App. 11.

Hope filed suit under Rev. Stat. § 1979, 42 U. S. C. § 1983, in the United States District Court for the Northern District of Alabama against three guards involved in the May incident, one of whom also handcuffed him to the hitching post in June.  The case was referred to a Magistrate Judge who treated the responsive affidavits filed by the defendants as a motion for summary judgment.  Without deciding whether "the very act of placing him on a restraining bar for a period of hours as a form of punishment" had violated the Eighth Amendment, the Magistrate concluded that the guards were entitled to qualified immunity.[4]  Supplemental App. to Pet. for Cert. 21.  The District Court agreed, and entered judgment for respondents.

The United States Court of Appeals for the Eleventh Circuit affirmed.  240 F. 3d 975 (2001).  Before reaching the

---

[2] "The most repeated complaint of the hitching post, however, was the strain it produced on inmates' muscles by forcing them to remain in a standing position with their arms raised in a stationary position for a long period of time.  In addition to their exposure to sunburn, dehydration, and muscle aches, the inmates are also placed in substantial pain when the sun heats the handcuffs that shackle them to the hitching post, or heats the hitching post itself.  Several of the inmates described the way in which the handcuffs burned and chafed their skin during their placement on the post."  Id., at 1248.

[3] The Court of Appeals noted that respondents had not produced any activity log for this incident, despite the policy that required that such a log be maintained.  240 F. 3d, at 977, n. 1.

[4] Supplemental App. to Pet. for Cert. 21–27.

qualified immunity issue, however, it answered the constitutional question that the District Court had bypassed. The court found that the use of the hitching post for punitive purposes violated the Eighth Amendment. Nevertheless, applying Circuit precedent concerning qualified immunity, the court stated that "'the federal law by which the government official's conduct should be evaluated must be preexisting, obvious and mandatory,'" and established, not by "'abstractions,'" but by cases that are "'materially similar'" to the facts in the case in front of us." *Id.*, at 981. The court then concluded that the facts in the two precedents on which Hope primarily relied—*Ort* v. *White*, 813 F. 2d 318 (CA11 1987); and *Gates* v. *Collier*, 501 F. 2d 1291 (CA5 1974)—"[t]hough analogous," were not "'materially similar' to Hope's situation.'" 240 F. 3d, at 981. We granted certiorari to review the Eleventh Circuit's qualified immunity holding. 534 U. S. 1073 (2002).

## II

The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation. *Saucier* v. *Katz*, 533 U. S. 194, 201 (2001). The Court of Appeals held that "the policy and practice of cuffing an inmate to a hitching post or similar stationary object for a period of time that surpasses that necessary to quell a threat or restore order is a violation of the Eighth Amendment." 240 F. 3d, at 980–981. The court rejected respondents' submission that Hope could have ended his shackling by offering to return to work, finding instead that the purpose of the practice was punitive,[5] and that the circumstances of his confinement created

---

[5] In reaching this conclusion, the Court of Appeals stated: "While the DOC claims that Hope would have been released from the hitching post had he asked to return to work, the evidence suggests this is not the case. First, Hope never refused to work. During the May incident, he was the victim in an altercation on the work site, but he never refused to do his

a substantial risk of harm of which the officers were aware. Moreover, the court relied on Circuit precedent condemning similar practices[6] and the results of a United States Department of Justice (DOJ) report that found Alabama's systematic use of the hitching post to be improper corporal punishment.[7] We agree with the Court of Appeals that the attachment of Hope to the hitching post under the circumstances alleged in this case violated the Eighth Amendment.

" '[T]he unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment.' " *Whitley* v. *Albers*, 475 U. S. 312, 319 (1986) (some internal quotation marks omitted). We have said that "[a]mong 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.' " *Rhodes* v. *Chapman*, 452 U. S. 337, 346 (1981). In making this determination in the context of prison condi-

---

job. During the June incident, Hope was involved in an altercation with prison guards. There is nothing in the record, however, claiming that he refused to work or encouraged other inmates to refuse to work. Therefore, it is not clear that the solution to his hitching post problem was to ask to return to work. Second, Hope was placed in a car and driven back to Limestone to be cuffed to the hitching post on both occasions. Given the facts, it is improbable that had Hope said, 'I want to go back to work,' a prison guard would have left his post at Limestone to drive Hope back to the work site. It is more likely that the guards left Hope on the post until his work detail returned to teach the other inmates a lesson." 240 F. 3d, at 980.

[6] "Since abolishing the pillory over a century ago, our system of justice has consistently moved away from forms of punishment similar to hitching posts in prisons. In *Gates* v. *Collier*, 501 F. 2d 1291 (5th Cir. 1974), in regard to 'handcuffing inmates to the fence and to cells for long periods of time' and other such punishments, we stated that '[w]e have no difficulty in reaching the conclusion that these forms of corporal punishment run afoul of the Eighth Amendment, offend contemporary concepts of decency, human dignity, and precepts of civilization which we profess to possess.' *Gates*, 501 F. 2d at 1306." *Id.*, at 979.

[7] The DOJ report apparently was not before the District Court in this case, but the Court of Appeals took judicial notice of the report and referenced it throughout the decision below. *Id.*, at 979, n. 8.

tions, we must ascertain whether the officials involved acted with "deliberate indifference" to the inmates' health or safety. *Hudson* v. *McMillian*, 503 U. S. 1, 8 (1992). We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious. *Farmer* v. *Brennan*, 511 U. S. 825, 842 (1994).

As the facts are alleged by Hope, the Eighth Amendment violation is obvious. Any safety concerns had long since abated by the time petitioner was handcuffed to the hitching post because Hope had already been subdued, handcuffed, placed in leg irons, and transported back to the prison. He was separated from his work squad and not given the opportunity to return to work. Despite the clear lack of an emergency situation, the respondents knowingly subjected him to a substantial risk of physical harm, to unnecessary pain caused by the handcuffs and the restricted position of confinement for a 7-hour period, to unnecessary exposure to the heat of the sun, to prolonged thirst and taunting, and to a deprivation of bathroom breaks that created a risk of particular discomfort and humiliation.[8] The use of the hitching post under these circumstances violated the "basic concept underlying the Eighth Amendment[, which] is nothing less than the dignity of man." *Trop* v. *Dulles*, 356 U. S. 86, 100 (1958). This punitive treatment amounts to gratuitous infliction of "wanton and unnecessary" pain that our precedent clearly prohibits.

---

[8] The awareness of the risk of harm attributable to any individual respondent may be evaluated in part by considering the pattern of treatment that inmates generally received when attached to the hitching post. In *Austin* v. *Hopper*, the District Court cited examples of humiliating incidents resulting from the denial of bathroom breaks. One inmate "was not permitted to use the restroom or to change his clothing for four and one-half hours after he had defecated on himself." 15 F. Supp. 2d, at 1246. "Moreover, certain corrections officers not only ignored or denied inmates' requests for water or access to toilet facilities, but taunted them while they were clearly suffering from dehydration . . . ." *Id.*, at 1247.

## III

Despite their participation in this constitutionally impermissible conduct, respondents may nevertheless be shielded from liability for civil damages if their actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow* v. *Fitzgerald*, 457 U. S. 800, 818 (1982). In assessing whether the Eighth Amendment violation here met the *Harlow* test, the Court of Appeals required that the facts of previous cases be "'materially similar' to Hope's situation." 240 F. 3d, at 981. This rigid gloss on the qualified immunity standard, though supported by Circuit precedent,[9] is not consistent with our cases.

As we have explained, qualified immunity operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier* v. *Katz*, 533 U. S., at 206. For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, see *Mitchell* [v. *Forsyth*, 472 U. S. 511,] 535, n. 12; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson* v. *Creighton*, 483 U. S. 635, 640 (1987).

Officers sued in a civil action for damages under 42 U. S. C. § 1983 have the same right to fair notice as do defendants charged with the criminal offense defined in 18 U. S. C. § 242. Section 242 makes it a crime for a state official to act "willfully" and under color of law to deprive a person of rights protected by the Constitution. In *United States* v. *Lanier*, 520 U. S. 259 (1997), we held that the defendant was entitled

---

[9] See, e. g., *Suissa* v. *Fulton County*, 74 F. 3d 266–270 (CA11 1996); *Lassiter* v. *Alabama A&M Univ. Bd. of Trustees*, 28 F. 3d 1146, 1150 (CA11 1994); *Hill* v. *Dekalb Regional Youth Detention Center*, 40 F. 3d 1176, 1185 (CA11 1994).

to "fair warning" that his conduct deprived his victim of a constitutional right, and that the standard for determining the adequacy of that warning was the same as the standard for determining whether a constitutional right was "clearly established" in civil litigation under § 1983.[10]

In *Lanier*, the Court of Appeals had held that the indictment did not charge an offense under § 242 because the constitutional right allegedly violated had not been identified in any earlier case involving a factual situation " 'fundamentally similar' " to the one in issue. *Id.*, at 263 (citing *United States* v. *Lanier*, 73 F. 3d 1380, 1393 (CA6 1996)). The Court of Appeals had assumed that the defendant in a criminal case was entitled to a degree of notice " 'substantially higher than the "clearly established" standard used to judge qualified immunity' " in civil cases under § 1983. 520 U. S., at 263. We reversed, explaining that the "fair warning" requirement is identical under § 242 and the qualified immunity standard. We pointed out that we had "upheld convictions under § 241 or § 242 despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Id.*, at 269. We explained:

> "This is not to say, of course, that the single warning standard points to a single level of specificity sufficient in every instance. In some circumstances, as when an

---

[10] "[T]he object of the 'clearly established' immunity standard is not different from that of 'fair warning' as it relates to law 'made specific' for the purpose of validly applying § 242. The fact that one has a civil and the other a criminal law role is of no significance; both serve the same objective, and in effect the qualified immunity test is simply the adaptation of the fair warning standard to give officials (and, ultimately, governments) the same protection from civil liability and its consequences that individuals have traditionally possessed in the face of vague criminal statutes. To require something clearer than 'clearly established' would, then, call for something beyond 'fair warning.' " 520 U. S., at 270–271.

earlier case expressly leaves open whether a general rule applies to the particular type of conduct at issue, a very high degree of prior factual particularity may be necessary. But general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful,' *Anderson, supra*, at 640." *Id.*, at 270–271 (citation omitted).

Our opinion in *Lanier* thus makes clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances. Indeed, in *Lanier*, we expressly rejected a requirement that previous cases be "fundamentally similar." Although earlier cases involving "fundamentally similar" facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding. The same is true of cases with "materially similar" facts. Accordingly, pursuant to *Lanier*, the salient question that the Court of Appeals ought to have asked is whether the state of the law in 1995 gave respondents fair warning that their alleged treatment of Hope was unconstitutional. It is to this question that we now turn.

## IV

The use of the hitching post as alleged by Hope "unnecessar[ily] and wanton[ly] inflicted pain," *Whitley*, 475 U. S., at 319 (internal quotation marks omitted), and thus was a clear violation of the Eighth Amendment. See Part II, *supra*. Arguably, the violation was so obvious that our own Eighth Amendment cases gave respondents fair warning that their conduct violated the Constitution. Regardless, in light of binding Eleventh Circuit precedent, an Alabama Department of Corrections (ADOC) regulation, and a DOJ report

informing the ADOC of the constitutional infirmity in its use of the hitching post, we readily conclude that the respondents' conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U. S., at 818.

Cases decided by the Court of Appeals for the Fifth Circuit before 1981 are binding precedent in the Eleventh Circuit today. See *Bonner* v. *Prichard*, 661 F. 2d 1206 (CA11 1981). In one of those cases, decided in 1974, the Court of Appeals reviewed a District Court decision finding a number of constitutional violations in the administration of Mississippi's prisons. *Gates* v. *Collier*, 501 F. 2d 1291. That opinion squarely held that several of those "forms of corporal punishment run afoul of the Eighth Amendment [and] offend contemporary concepts of decency, human dignity, and precepts of civilization which we profess to possess." *Id.*, at 1306. Among those forms of punishment were "handcuffing inmates to the fence and to cells for long periods of time, . . . and forcing inmates to stand, sit or lie on crates, stumps, or otherwise maintain awkward positions for prolonged periods." *Ibid.* The fact that *Gates* found several forms of punishment impermissible does not, as respondents suggest, lessen the force of its holding with respect to handcuffing inmates to cells or fences for long periods of time. Nor, for the purpose of providing fair notice to reasonable officers administering punishment for past misconduct, is there any reason to draw a constitutional distinction between a practice of handcuffing an inmate to a fence for prolonged periods and handcuffing him to a hitching post for seven hours. The Court of Appeals' conclusion to the contrary exposes the danger of a rigid, overreliance on factual similarity. As the Government submits in its brief *amicus curiae:* "No reasonable officer could have concluded that the constitutional holding of *Gates* turned on the fact that inmates were handcuffed to fences or the bars of cells, rather than a specially designed metal bar designated for shackling. If anything, the use of

a designated hitching post highlights the constitutional problem." Brief for United States as *Amicus Curiae* 22. In light of *Gates,* the unlawfulness of the alleged conduct should have been apparent to respondents.

The reasoning, though not the holding, in a case decided by the Eleventh Circuit in 1987 sent the same message to reasonable officers in that Circuit. In *Ort* v. *White,* 813 F. 2d 318, the Court of Appeals held that an officer's temporary denials of drinking water to an inmate who repeatedly refused to do his share of the work assigned to a farm squad "should not be viewed as punishment in the strict sense, but instead as necessary coercive measures undertaken to obtain compliance with a reasonable prison rule, *i. e.,* the requirement that all inmates perform their assigned farm squad duties." *Id.,* at 325. "The officer's clear motive was to encourage Ort to comply with the rules and to do the work required of him, after which he would receive the water like everyone else." *Ibid.* The court cautioned, however, that a constitutional violation might have been present "if later, once back at the prison, officials had decided to deny [Ort] water as punishment for his refusal to work." *Id.,* at 326. So too would a violation have occurred if the method of coercion reached a point of severity such that the recalcitrant prisoner's health was at risk. *Ibid.* Although the facts of the case are not identical, *Ort's* premise is that "physical abuse directed at [a] prisoner *after* he terminate[s] his resistance to authority would constitute an actionable eighth amendment violation." *Id.,* at 324. This premise has clear applicability in this case. Hope was not restrained at the worksite until he was willing to return to work. Rather, he was removed back to the prison and placed under conditions that threatened his health. *Ort* therefore gave fair warning to respondents that their conduct crossed the line of what is constitutionally permissible.

Relevant to the question whether *Ort* provided fair warning to respondents that their conduct violated the Constitu-

tion is a regulation promulgated by ADOC in 1993.[11]  The regulation authorizes the use of the hitching post when an inmate refuses to work or is otherwise disruptive to a work squad.  It provides that an activity log should be completed for each such inmate, detailing his responses to offers of water and bathroom breaks every 15 minutes.  Such a log was completed and maintained for petitioner's shackling in May, but the record contains no such log for the 7-hour shackling in June and the record indicates that the periodic offers contemplated by the regulation were not made.  App. 43–48.  The regulation also states that an inmate "will be allowed to join his assigned squad" whenever he tells an officer "that he is ready to go to work." *Id.*, at 103.  The findings in *Austin* v. *Hopper*, 15 F. Supp. 2d 1210, 1244–1246 (MD Ala. 1998), as well as the record in this case, indicate that this important provision of the regulation was frequently ignored by corrections officers.  If regularly observed, a requirement that would effectively give the inmate the keys to the handcuffs that attached him to the hitching post would have made this case more analogous to the practice upheld in *Ort*, rather than the kind of punishment *Ort* described as impermissible.  A course of conduct that tends to prove that the requirement was merely a sham, or that respondents could ignore it with impunity, provides equally strong support for the conclusion that they were fully aware of the wrongful character of their conduct.

Respondents violated clearly established law.  Our conclusion that "a reasonable person would have known," *Harlow*, 457 U. S., at 818, of the violation is buttressed by the fact that the DOJ specifically advised the ADOC of the unconstitutionality of its practices before the incidents in this case took place.  The DOJ had conducted a study in 1994 of Alabama's use of the hitching post.  240 F. 3d, at 979.

---

[11] The regulation was not provided to the District Court, but it was added to the record at the request of the Court of Appeals.  See App. 100–106.

Among other findings, the DOJ report noted that ADOC's officers consistently failed to comply with the policy of immediately releasing any inmate from the hitching post who agrees to return to work. The DOJ concluded that the systematic use of the restraining bar in Alabama constituted improper corporal punishment. *Ibid.* Accordingly, the DOJ advised the ADOC to cease use of the hitching post in order to meet constitutional standards. The ADOC replied that it thought the post could permissibly be used " 'to preserve prison security and discipline.' " *Ibid.* In response, the DOJ informed the ADOC that, " '[a]lthough an emergency situation may warrant drastic action by corrections staff, our experts found that the "rail" is being used systematically as an improper punishment for relatively trivial offenses. Therefore, we have concluded that the use of the "rail" is without penological justification.' " *Ibid.* Although there is nothing in the record indicating that the DOJ's views were communicated to respondents, this exchange lends support to the view that reasonable officials in the ADOC should have realized that the use of the hitching post under the circumstances alleged by Hope violated the Eighth Amendment prohibition against cruel and unusual punishment.

The obvious cruelty inherent in this practice should have provided respondents with some notice that their alleged conduct violated Hope's constitutional protection against cruel and unusual punishment. Hope was treated in a way antithetical to human dignity—he was hitched to a post for an extended period of time in a position that was painful, and under circumstances that were both degrading and dangerous. This wanton treatment was not done of necessity, but as punishment for prior conduct. Even if there might once have been a question regarding the constitutionality of this practice, the Eleventh Circuit precedent of *Gates* and *Ort,* as well as the DOJ report condemning the practice, put a reasonable officer on notice that the use of the hitching

post under the circumstances alleged by Hope was unlawful. The "fair and clear warning," *Lanier*, 520 U. S., at 271, that these cases provided was sufficient to preclude the defense of qualified immunity at the summary judgment stage.

## V

In response to JUSTICE THOMAS' thoughtful dissent, we make the following three observations. The first is that in granting certiorari to review the summary judgment entered in favor of the officers, we did not take any question about the sufficiency of pleadings and affidavits to raise a genuine possibility that the three named officers were responsible for the punitive acts of shackling alleged. All questions raised by petitioner (the plaintiff against whom summary judgment was entered) go to the application of the standard that no immunity is available for official acts when "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier* v. *Katz*, 533 U. S., at 202. The officers' brief in opposition to certiorari likewise addressed only the legal standard of what is clearly established. The resulting focus in the case was the Eleventh Circuit's position that a violation is not clearly established unless it is the subject of a prior case of liability on facts "'materially similar'" to those charged. 240 F. 3d, at 981. We did not take, and do not pass upon, the questions whether or to what extent the three named officers may be held responsible for the acts charged, if proved. Nothing in our decision forecloses any defense other than qualified immunity on the ground relied upon by the Court of Appeals.

Second, we may address the immunity question on the assumption that the act of field discipline charged on each occasion was handcuffing Hope to a hitching post for an extended period apparently to inflict gratuitous pain or discomfort, with no justification in threatened harm or a continuing refusal to work. *Id.*, at 980 (on neither occasion did Hope "refus[e] to work or encourag[e] other inmates to refuse to

work"). The Court of Appeals clearly held the act of cuffing petitioner to the hitching post itself to suffice as an unconstitutional act: "We find that cuffing an inmate to a hitching post for a period of time extending past that required to address an immediate danger or threat is a violation of the Eighth Amendment." *Ibid.* Although the court continued that "[t]his violation is exacerbated by the lack of proper clothing, water, or bathroom breaks," *ibid.*, this embellishment was not the basis of its decision, and our own decision adequately rests on the same assumption that sufficed for the Court of Appeals.

Third, in applying the objective immunity test of what a reasonable officer would understand, the significance of federal judicial precedent is a function in part of the Judiciary's structure. The unreported District Court opinions cited by the officers are distinguishable on their own terms.[12] But regardless, they would be no match for the Circuit precedents[13] in *Gates* v. *Collier*, 501 F. 2d, at 1306, which held that "handcuffing inmates to the fence and to cells for long periods of time" was unconstitutional, and *Ort* v. *White*, 813 F. 2d, at 326, which suggested that it would be unconstitutional to inflict gratuitous pain on an inmate (by refusing him water) when punishment was unnecessary to enforce

---

[12] In three of the decisions, the inmates were given the choice between working or being restrained. See *Whitson* v. *Gillikin*, No. CV-93-H-1517-NE (ND Ala., Jan. 24, 1994), p. 4, App. 84; *Dale* v. *Murphy*, No. CV-85-1091-H-S (SD Ala., Feb. 4, 1986), p. 2; *Ashby* v. *Dees*, No. CV-94-U-0605-NE (ND Ala., Dec. 27, 1994), p. 6. In others, the inmates were offered regular water and bathroom breaks. See *Lane* v. *Findley*, No. CV-93-C-1741-S (ND Ala., Aug. 4, 1994), p. 9; *Williamson* v. *Anderson*, No. CV-92-H-675-N (MD Ala., Aug. 18, 1993), p. 2; *Hollis* v. *Folsom*, No. CV-94-T-0052-N (MD Ala., Nov. 4, 1994), p. 9. Finally, in *Vinson* v. *Thompson*, No. CV-94-A-268-N (MD Ala., Dec. 9, 1994), the inmate was restrained for approximately 45 minutes. *Id.*, at 2.

[13] There are apparently no decisions on similar facts from other Circuits, presumably because Alabama is the only State to authorize the use of the hitching post in its prison system.

on-the-spot discipline. The vitality of *Gates* and *Ort* could not seriously be questioned in light of our own decisions holding that gratuitous infliction of punishment is unconstitutional, even in the prison context, see *supra*, at 737 (citing *Whitley* v. *Albers*, 475 U. S., at 319; *Rhodes* v. *Chapman*, 452 U. S., at 346).

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE THOMAS, with whom THE CHIEF JUSTICE and JUSTICE SCALIA join, dissenting.

The Court today subjects three prison guards to suit based on facts not alleged, law not clearly established, and its own subjective views on appropriate methods of prison discipline. Qualified immunity jurisprudence has been turned on its head.

I

Petitioner Larry Hope did not file this action against the State of Alabama. Nor did he sue all of the Alabama prison guards responsible for looking after him in the two instances that he was handcuffed to the restraining bar.[1] He chose instead to maintain this lawsuit against only three prison guards: Officer Gene McClaran, Sergeant Mark Pelzer, and Lieutenant Jim Gates. See 240 F. 3d 975, 977, n. 2 (CA11 2001).[2] It is therefore strange that in the course of deciding that none of the three respondents is entitled to qualified

[1] Despite the Court's consistent use of the term "hitching post," the apparatus to which petitioner was handcuffed is a "restraining bar." See Ala. Dept. of Corrections Admin. Reg. No. 429, p. 1 (Oct. 26, 1993), reprinted in App. 102.

[2] While petitioner also sued five other guards in connection with the fight that occurred before he was affixed to the restraining bar on June 7, 1995, he later withdrew his claims against them and asked that they be dismissed from the case. See 240 F. 3d, at 977, n. 2; Plaintiff's Special Report and Brief in Response to Defendants' Motion for Summary Judgment (ND Ala.), pp. 1–2, 5–6, Record, Doc. No. 33.

immunity the Court does not even bother to mention the nature of petitioner's specific allegations against McClaran, Pelzer, and Gates. The omission is both glaring and telling. When one examines the alleged conduct of the prison guards who are parties to this action, as opposed to the alleged conduct of *other* guards, who are *not* parties to this action, petitioner's case becomes far less compelling.

The Court's imprecise account of the facts requires that the specific nature of petitioner's allegations against the three respondents be recounted. Petitioner claims that: (1) on May 11, 1995, Officer McClaran ordered that petitioner be affixed to the restraining bar;[3] (2) Sergeant Pelzer, on that same date, affixed him to the restraining bar;[4] and (3) Lieutenant Gates, on May 11 and June 7, 1995, affixed petitioner to the bar.[5] That is the sum and substance of petitioner's allegations against respondents.[6]

With respect to McClaran and Pelzer, petitioner has *never* alleged that they participated in the June 7 incident that so

---

[3] See Second Affidavit of Larry Hope (ND Ala.), at 2–3, Record, Doc. No. 32.

[4] *Id.*, at 3.

[5] *Id.*, at 3–4.

[6] There is some confusion as to who actually affixed petitioner to the restraining bar on May 11. While petitioner "believe[s]" that Sergeant Pelzer did so, *id.*, at 3, the "Institutional Incident Report" produced by respondents and written by Officer McClaran indicates that Officers Keith Gates and Mark Dempsey placed petitioner on the bar, see *id.*, Exh. 2. Petitioner acknowledged that fact and attached the report to his second affidavit. See *id.*, at 3. Consequently, interpreting petitioner's pleadings in the light most favorable to him, I will assume that petitioner has alleged that Pelzer, Gates, and Dempsey cuffed him to the bar on May 11. Additionally, I will assume that the "Officer Keith Gates" mentioned in Officer McClaran's report is the same person as the Lieutenant Jim Gates who is a respondent in this case. It is worth noting, however, that respondents vigorously dispute petitioner's assertion that Lieutenant Jim Gates and Officer Keith Gates are one and the same, see Brief for Respondents i, and petitioner has yet to produce any evidence to support this somewhat incredible claim.

appalls the Court.[7]  And with respect to Lieutenant Gates, petitioner has never alleged that Gates either participated in or was responsible for any of the June 7 events recounted by the Court other than attaching petitioner to the bar.  Petitioner has never contended that Gates looked after or otherwise supervised him while he was on the bar.  See Second Affidavit of Larry Hope (ND Ala.), Record, Doc. No. 32. Nor has petitioner ever claimed that Gates was responsible for keeping him on the bar for seven hours, removing his shirt,[8] denying him water, taunting him about his thirst, or giving water to dogs in petitioner's plain view.  See *ibid.* The relevance of these facts, repeatedly referenced by the Court during the course of its legal analysis, see, *e. g., ante,* at 738, 744, therefore escapes me.

Then there are the events referenced in the Court's opinion that cannot even arguably be gleaned from the record. For instance, while the Court claims that on June 7 petitioner "was given no bathroom breaks," *ante,* at 735, during his time on the bar, petitioner has never alleged that Gates or any other prison guard refused him bathroom breaks on that date.  See Second Affidavit of Larry Hope, Record, Doc. No. 32.  As a matter of fact, the District Court expressly found below that petitioner "was not denied restroom

---

[7] See, *e. g.,* Plaintiff's Special Report and Brief in Response to Defendant's Motion for Summary Judgment 1–2, Record, Doc. No. 33 ("[T]he only remaining claims are those against Defendants McClaran, Pelzer, and Gates in connection with the May 11, 1997 hitching post incident, and Defendant Gates in connection with the June 7 hitching post incident"); Second Affidavit of Larry Hope, Record, Doc. No. 32.

[8] It is important to note that petitioner has never maintained that Gates placed him on the bar without a shirt.   Rather, petitioner's first affidavit, see Affidavit of Larry Hope 2, Record, Doc. No. 1, as well as photographs appended as exhibits to petitioner's second affidavit, see Second Affidavit of Larry Hope, Exhs. 3–5, Record, Doc. No. 32, which were verified by petitioner as "taken while [he] was on the hitching post on June 7," *id.,* at 5, indicate that petitioner's shirt was removed, if at all, after he was attached to the bar.

breaks." Supplemental App. to Pet. for Cert. 2. In addition, photographs taken of petitioner attached to the restraining bar on June 7 show him wearing a t-shirt, revealing at a minimum that petitioner was not shirtless "all day." See Second Affidavit of Larry Hope, Exhs. 3–5, Record, Doc. No. 32; *id.*, at 5 (verifying that the photographs were "taken while [he] was on the hitching post on June 7").

Once one understands petitioner's specific allegations against respondents, the Eighth Amendment violation in this case is far from "obvious." *Ante,* at 738. What is "obvious," however, is that the Court's explanation of how respondents violated the Eighth Amendment is woefully incomplete. The Court merely recounts petitioner's allegations regarding the events of June 7 and concludes that "[t]he use of the hitching post under these circumstances violated the 'basic concept underlying the Eighth Amendment[,] [which] is nothing less than the dignity of man.'" *Ibid.* (quoting *Trop* v. *Dulles,* 356 U. S. 86, 100 (1958)). The Court, however, fails to explain how respondents McClaran and Pelzer violated the Eighth Amendment, given that they had no involvement whatsoever in affixing petitioner to the restraining bar on June 7. The Court's reasoning as applied to respondent Gates is similarly inadequate since petitioner has never alleged that Gates bore any responsibility for most of the conduct on June 7 that supposedly renders the Eighth Amendment violation "obvious."[9]

_____

[9] In an effort to rehabilitate the Court's opinion, JUSTICE STEVENS argues that the specific nature of respondents' connection to the events of May 11 and June 7 falls outside the scope of the questions presented. See *ante,* at 746. In conducting qualified immunity analysis, however, courts do not merely ask whether, taking the plaintiff's allegations as true, the plaintiff's clearly established rights were violated. Rather, courts must consider as well whether each defendant's alleged conduct violated the plaintiff's clearly established rights. For instance, an allegation that Defendant A violated a plaintiff's clearly established rights does nothing to overcome Defendant B's assertion of qualified immunity, absent some allegation that Defendant B was responsible for Defendant A's conduct. Sim-

## II

Once petitioner's allegations regarding respondents' conduct are separated from his other grievances and the mistreatment invented by the Court, this case presents one simple question: Was it clearly established in 1995 that the mere act of cuffing petitioner to the restraining bar (or, in the case of Officer McClaran, ordering petitioner's attachment to the restraining bar) violated the Eighth Amendment? The answer to this question is also simple: Obviously not.

### A

The Court correctly states that respondents are entitled to qualified immunity unless their conduct violated " 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Ante*, at 739 (quoting *Harlow* v. *Fitzgerald*, 457 U. S. 800, 818 (1982)). But the Court then fails either to discuss or to apply the following important principles. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley* v. *Briggs*, 475 U. S. 335, 341 (1986). If "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted," then qualified immunity does not apply. *Saucier* v. *Katz*, 533 U. S. 194, 202 (2001). But if, on the other hand, "officers of reasonable competence could disagree on th[e] issue, immunity should be recognized." *Malley, supra,* at 341.

In evaluating whether it was clearly established in 1995 that respondents' conduct violated the Eighth Amendment, the Court of Appeals properly noted that "[i]t is important to analyze the facts in [the prior cases relied upon by petitioner where courts found Eighth Amendment violations],

---

ilarly here, in the absence of any allegation by petitioner that respondents were in any way responsible for the behavior of other prison guards on May 11 and June 7, the conduct of those other guards should not be considered in analyzing whether respondents are entitled to qualified immunity.

and determine if they are materially similar to the facts in the case in front of us." 240 F. 3d, at 981 (internal quotation marks omitted). The right not to suffer from "cruel and unusual punishments," U. S. Const., Amdt. 8, is an extremely abstract and general right. In the vast majority of cases, the text of the Eighth Amendment does not, in and of itself, give a government official sufficient notice of the clearly established Eighth Amendment law applicable to a particular situation.[10] Rather, one must look to case law to see whether "the right the official is alleged to have violated [has] been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson* v. *Creighton*, 483 U. S. 635, 640 (1987).

In conducting this inquiry, it is crucial to look at precedent applying the relevant legal rule in similar factual circumstances. Such cases give government officials the best indication of what conduct is unlawful in a given situation. If, for instance, "various courts have agreed that certain conduct [constitutes an Eighth Amendment violation] under facts not distinguishable in a fair way from the facts presented in the case at hand," *Saucier, supra,* at 202, then a plaintiff would have a compelling argument that a defendant is not entitled to qualified immunity.

That is not to say, of course, that conduct can be "clearly established" as unlawful only if a court has already passed on the legality of that behavior under materially similar circumstances. Certain actions so obviously run afoul of the law that an assertion of qualified immunity may be overcome even though court decisions have yet to address "materially similar" conduct. Or, as the Court puts it, "officials can still

---

[10] Cf. *Saucier* v. *Katz*, 533 U. S. 194, 201–202 (2001) (discounting as too general the principle that a police officer's use of force violates the Fourth Amendment if it is excessive under objective standards of reasonableness).

be on notice that their conduct violates established law even in novel factual circumstances." *Ante,* at 741.

Although the Court argues that the Court of Appeals has improperly imposed a "rigid gloss on the qualified immunity standard," *ante,* at 739, and n. 9, requiring that the facts of a previous case be materially similar to a plaintiff's circumstances for qualified immunity to be overcome, this suggestion is plainly wrong. Rather, this Court of Appeals has repeatedly made clear that it imposes no such requirement on plaintiffs seeking to defeat an assertion of qualified immunity. See, *e. g., Priester* v. *Riviera Beach,* 208 F. 3d 919, 926 (CA11 2000) (stating that qualified immunity does not apply if an official's conduct "was so far beyond the hazy border between excessive and acceptable force that [the official] had to know he was violating the Constitution even without caselaw on point" (internal quotation marks omitted)); *Smith* v. *Mattox,* 127 F. 3d 1416, 1419 (CA11 1997) (noting that a plaintiff can overcome an assertion of qualified immunity by demonstrating "that the official's conduct lies so obviously at the very core of what the [Constitution] prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw"); *Lassiter* v. *Alabama A&M Univ.,* 28 F. 3d 1146, 1150, n. 4 (CA11 1994) ("[O]ccasionally the words of a federal statute or federal constitutional provision will be specific enough to establish the law applicable to particular circumstances clearly and to overcome qualified immunity even in the absence of case law").

Similarly, it is unfair to read the Court of Appeals' decision as adopting such a "rigid gloss" here. Nowhere did the Court of Appeals state that petitioner, in order to overcome respondents' assertion of qualified immunity, was required to produce precedent addressing "materially similar" facts. Rather, the Court of Appeals merely (and sensibly) evaluated the cases relied upon by petitioner to determine whether they involved facts "materially similar" to those

present in this case. See 240 F. 3d, at 981 ("It is important to analyze the facts in these cases, and determine if they are 'materially similar' to the facts in the case in front of us").

To be sure, the Court of Appeals did not also ask whether respondents' conduct so obviously violated the Eighth Amendment that respondents' assertion of qualified immunity could be overcome in the absence of case law involving "materially similar" facts. The majority must believe that the Court of Appeals, therefore, has implicitly abandoned its prior qualified immunity jurisprudence. I, on the other hand, believe it is far more likely that the Court of Appeals omitted such a discussion from its opinion for a much simpler reason: Given petitioner's allegations, it thought that the argument was so weak, and the alleged actions of respondents so far removed from "'the hazy border between excessive and acceptable force,'" *Priester, supra,* at 926 (quoting *Smith, supra,* at 1419), that it was not worth mentioning.

## B

Turning to the merits of respondents' assertion that they are entitled to qualified immunity, the relevant question is whether it should have been clear to McClaran, Pelzer, and Gates in 1995 that attaching petitioner to a restraining bar violated the Eighth Amendment. As the Court notes, at that time Alabama was the only State that used this particular disciplinary method when prisoners refused to work or disrupted work squads. See *ante,* at 733. Previous litigation over Alabama's use of the restraining bar, however, did nothing to warn reasonable Alabama prison guards that attaching a prisoner to a restraining bar was unlawful, let alone that the illegality of such conduct was clearly established. In fact, the outcome of those cases effectively forecloses petitioner's claim that it should have been clear to respondents in 1995 that handcuffing petitioner to a restraining bar violated the Eighth Amendment.

For example, a year before the conduct at issue in this case took place, the United States District Court for the Northern District of Alabama rejected the Eighth Amendment claim of an Alabama prisoner who was attached to a restraining bar for five hours after he refused to work and scuffled with guards. See *Lane* v. *Findley*, No. CV–93–C–1741–S (Aug. 4, 1994). The District Court reasoned that attaching the prisoner to a restraining bar "was a measured response to a potentially volatile situation and a clear warning to other inmates that refusal to work would result in immediate discipline subjecting the offending inmate to similar conditions experienced by work detail inmates rather than a return to inside the institution." *Id.*, at 9. The District Court therefore concluded that there was a "substantial penological justification" for attaching the plaintiff to the restraining bar. *Ibid.*

Both the Court and petitioner attempt to distinguish this case from *Lane* on the grounds that the prisoner in *Lane* was "offered regular water and bathroom breaks" while on the restraining bar. See *ante*, at 747, n. 12; Reply Brief for Petitioner 16, n. 5. But this argument fails for two reasons: (1) Respondents McClaran and Pelzer were involved only in the May 11 incident, and it is undisputed that petitioner was offered water and a bathroom break every 15 minutes during his 2 hours on the bar that day; and (2) petitioner, as previously mentioned, has never alleged that respondent Gates was responsible for denying him water or bathroom breaks on June 7.

The same year that it decided *Lane*, the United States District Court for the Northern District of Alabama dismissed another complaint filed by an Alabama prisoner who was handcuffed to a restraining bar. In that case, the prisoner, after refusing to leave prison grounds with his work squad, was handcuffed to a restraining bar for eight hours. Temperatures allegedly reached 95 degrees while the prisoner was attached to the bar, and he was allegedly denied

food, water, and any opportunities to use bathroom facilities. See *Whitson* v. *Gillikin*, No. CV–93–H–1517–NE (Jan. 24, 1994), p. 7, App. 81. As a result of being handcuffed to the bar, the prisoner "suffered lacerations, pain, and swelling in his arms." *Id.*, at 85. The District Court, without deciding whether the defendants' conduct violated the Eighth Amendment, held that "there was no clearly established law identifying [their behavior] as unconstitutional." *Id.*, at 88.

Federal District Courts in five other Alabama cases decided before 1995 similarly rejected claims that handcuffing a prisoner to a restraining bar or other stationary object violated the Eighth Amendment. See, *e. g.*, *Ashby* v. *Dees*, No. CV–94–U–0605–NE (ND Ala., Dec. 27, 1994) (fence); *Vinson* v. *Thompson*, No. CV–94–A–268–N (MD Ala., Dec. 9, 1994) (restraining bar); *Hollis* v. *Folsom*, No. CV–94–T–0052–N (MD Ala., Nov. 4, 1994) (fence); *Williamson* v. *Anderson*, No. CV–92–H–675–N (MD Ala., Aug. 18, 1993) (fence); *Dale* v. *Murphy*, No. CV–85–1091–H–S (SD Ala., Feb. 4, 1986) (light pole).[11] By contrast, petitioner is unable to point to any Alabama decision issued before respondents

---

[11] The Court's attempt to distinguish away all of these decisions only serves to undermine further its qualified immunity analysis. The Court appears to suggest that affixing a prisoner to a restraining bar is not clearly unlawful so long as (1) guards provide the prisoner with water and regular bathroom breaks, or (2) the prisoner is placed on the restraining bar as a result of his refusal to work. See *ante*, at 747, n. 12. But as previously explained, see *supra*, at 756, petitioner was offered water and bathroom breaks every 15 minutes during his May 11 stay on the bar, and there has never been any allegation either that respondents McClaran and Pelzer were involved at all in the June 7 incident or that respondent Gates was responsible for denying petitioner water or bathroom breaks on that date. As a result, even under the Court's own view of the law, respondents are entitled to qualified immunity. Moreover, the Court nowhere explains how respondents were supposed to figure out in 1995 that it was permissible to affix prisoners to a restraining bar if they refused to work but it was unlawful to do so if they were disruptive while on work duty. The claim that such a distinction was clearly established in Eighth Amendment jurisprudence at that time is nothing short of incredible.

affixed him to the restraining bar holding that a prison guard engaging in such conduct violated the Eighth Amendment.

In the face of these decisions, and the absence of contrary authority, I find it impossible to conclude that respondents either were "plainly incompetent" or "knowingly violat[ing] the law" when they affixed petitioner to the restraining bar. *Malley,* 475 U. S., at 341. A reasonably competent prison guard attempting to obey the law is not only entitled to look at how courts have recently evaluated his colleagues' prior conduct, such judicial decisions are often the only place that a guard can look for guidance, especially in a situation where a State stands alone in adopting a particular policy.

## C

In concluding that respondents are not entitled to qualified immunity, the Court is understandably unwilling to hold that our Eighth Amendment jurisprudence clearly established in 1995 that attaching petitioner to a restraining bar violated the Eighth Amendment.[12] *Ante,* at 742. It is far from "obvious," *ante,* at 738, 741, that respondents, by attaching petitioner to a restraining bar, acted with "deliberate indifference" to his health and safety. *Hudson* v. *McMillian,* 503 U. S. 1, 8 (1992). Petitioner's allegations do not come close to suggesting that respondents knew that the mere act of at-

---

[12] I continue to believe that "[c]onditions of confinement are not punishment in any recognized sense of the term, unless imposed as part of a sentence." *Farmer* v. *Brennan,* 511 U. S. 825, 859 (1994) (THOMAS, J., concurring in judgment). As a result, I do not think, as an original matter, that attaching petitioner to the restraining bar constituted "punishment" under the Eighth Amendment. See *ibid.* Nevertheless, I recognize that this Court has embraced the opposite view—that the Eighth Amendment does regulate prison conditions not imposed as part of a sentence, see, *e. g.,* *Estelle* v. *Gamble,* 429 U. S. 97 (1976)—so I will apply that jurisprudence in evaluating whether respondents' conduct violated clearly established law. I note, however, that I remain open to overruling our dubious expansion of the Eighth Amendment in an appropriate case. See *Farmer, supra,* at 861–862 (THOMAS, J., concurring in judgment).

taching petitioner to the restraining bar imposed "a substantial risk of serious harm" upon him. See *Farmer* v. *Brennan*, 511 U. S. 825, 847 (1994). If, for instance, attaching petitioner to a restraining bar amounted to the "gratuitous infliction of 'wanton and unnecessary' pain," *ante*, at 738, it is curious that petitioner, while handcuffed to the bar on May 11, chose to decline most of the bathroom breaks offered to him. Respondents also affixed petitioner to the restraining bar for a legitimate penological purpose: encouraging his compliance with prison rules while out on work duty.

Moreover, if the application of this Court's general Eighth Amendment jurisprudence to the use of a restraining bar was as "obvious" as the Court claims, *ante*, at 738, 741, one wonders how Federal District Courts in Alabama could have repeatedly arrived at the opposite conclusion, and how respondents, in turn, were to realize that these courts had failed to grasp the "obvious."

## D

Unable to base its holding that respondents' conduct violated "'clearly established . . . rights of which a reasonable person would have known,'" *ante*, at 742 (quoting *Harlow*, 457 U. S., at 818), on this Court's precedents, the Court instead relies upon "binding Eleventh Circuit precedent, an Alabama Department of Corrections (ADOC) regulation, and a [Department of Justice] report informing the ADOC of the constitutional infirmity in its use of the hitching post," *ante*, at 741–742. I will address these sources in reverse order.

The Department of Justice report referenced by the Court does nothing to demonstrate that it should have been clear to respondents that attaching petitioner to a restraining bar violated his Eighth Amendment rights. To begin with, the Court concedes that there is no indication the Justice Department's recommendation that the ADOC stop using the restraining bar was ever communicated to respondents, prison guards in the small town of Capshaw, Alabama. See

*ante*, at 745.  In any event, an extraordinarily well-informed prison guard in 1995, who had read both the Justice Department's report and Federal District Court decisions addressing the use of the restraining bar, could have concluded only that there was a dispute as to whether handcuffing a prisoner to a restraining bar constituted an Eighth Amendment violation, not that such a practice was clearly unconstitutional.

The ADOC regulation relied upon by the Court not only fails to provide support for its holding today; the regulation weighs in respondents' favor because it expressly authorized prison guards to affix prisoners to a restraining bar when they were "disruptive to the work squad."  App. 102.  Alabama prison guards were entitled to rely on the validity of a duly promulgated state regulation instructing them to attach prisoners to a restraining bar under specified circumstances.  See *Wilson* v. *Layne*, 526 U. S. 603, 617 (1999) (crediting officer's reliance on Marshals Service policy as "important" to the conclusion that qualified immunity was warranted in an area where the state of the law "was at best undeveloped").  And, as the Court recounts, petitioner was placed on the restraining bar after entering into an argument with another inmate while on work duty (May 11) and a wrestling match with a guard when arriving at his work site (June 7).  *Ante,* at 734.

The Court argues that respondents must have been "aware of the wrongful character of their conduct" because they did not precisely abide by the policy set forth in the ADOC regulation.  *Ante,* at 744.  Even taking petitioner's allegations as true, however, I am at a loss to understand how respondents failed to comply with the regulation.  With respect to respondents McClaran and Pelzer, who were involved only in the May 11 incident, the Court concedes that the required activity log was filled out on that date, and petitioner was offered water and bathroom breaks every 15 minutes.  *Ante,* at 734, 744.  With respect to respondent Gates, the Court complains that no such log exists for petitioner's

June 7 stay on the bar and the record suggests that the periodic water and bathroom-break offers contemplated by the regulation were not made. Petitioner, however, has never alleged that Gates was responsible for supervising or looking after him once he was handcuffed to the post. He has only alleged that Gates placed him there.

While the Court also observes that the regulation provides that an inmate " 'will be allowed to join his assigned squad' " whenever he tells an officer " 'that he is ready to go to work,' " *ante*, at 744 (quoting App. 103), the Court again does not explain how any of the respondents in this case failed to observe this requirement. Petitioner has never alleged that he informed respondents or any other prison guard while he was on the bar that he was ready to go to work.

Finally, the "binding Eleventh Circuit precedent" relied upon by the Court, *ante*, at 741–743, was plainly insufficient to give respondents fair warning that their alleged conduct ran afoul of petitioner's Eighth Amendment rights. The Court of Appeals held in *Ort* v. *White*, 813 F. 2d 318 (CA11 1987), that a prison guard did not violate an inmate's Eighth Amendment rights by denying him water when he refused to work, and the Court admits that this holding provides no support for petitioner. Instead, it claims that the "reasoning" in *Ort* "gave fair warning to respondents that their conduct crossed the line of what is constitutionally permissible." *Ante*, at 743. But *Ort* provides at least as much support to respondents as it does to petitioner. For instance, *Ort* makes it abundantly clear that prison guards "have the authority to use that amount of force or those coercive measures reasonably necessary to enforce an inmate's compliance with valid prison rules" so long as such measures are not undertaken "maliciously or sadistically." 813 F. 2d, at 325.

To be sure, the Court correctly notes that the Court of Appeals in *Ort* suggested that it "might have reached a different decision" had the prison officer denied the inmate

water after he had returned to the prison instead of while he was out with the work squad. *Id.*, at 326. But the suggestion in dicta that a guard might have violated a prisoner's Eighth Amendment rights by denying him water once he returned from work duty does not come close to clearly establishing the unconstitutionality of attaching a disruptive inmate to a restraining bar after he is removed from his work squad and back within prison walls.

Admittedly, the other case upon which the Court relies, *Gates* v. *Collier*, 501 F. 2d 1291 (CA5 1974), is more on point. Nevertheless, *Gates* is also inadequate to establish clearly the unlawfulness of respondents' alleged conduct. In *Gates*, the Court of Appeals listed "handcuffing inmates to [a] fence and to cells for long periods of time" as one of many unacceptable forms of "physical brutality and abuse" present at a Mississippi prison. *Id.*, at 1306. Others included administering milk of magnesia as a form of punishment, depriving inmates of mattresses, hygienic materials, and adequate food, and shooting at and around inmates to keep them standing or moving. See *ibid.* The Court of Appeals had "no difficulty in reaching the conclusion that these forms of corporal punishment run afoul of the Eighth Amendment." *Ibid.*

It is not reasonable, however, to read *Gates* as establishing a bright-line rule forbidding the attachment of prisoners to a restraining bar. For example, in referring to the fact that prisoners were handcuffed to a fence and cells "for long periods of time," the Court of Appeals did not indicate whether it considered a "long period of time" to be 1 hour, 5 hours, or 25 hours. The Court of Appeals also provided no explanation of the circumstances surrounding these incidents. The opinion does not indicate whether the handcuffed prisoners were given water and suitable restroom breaks or whether they were handcuffed in a bid to induce them to comply with prison rules. In the intervening 21 years between *Gates* and the time respondents affixed petitioner to

the restraining bar, there were no further decisions clarifying the contours of the law in this area. Therefore, as another court interpreting *Gates* has noted: "There is no blanket prohibition against the use of punishment such as the hitching post in *Gates* which would signal to the Commissioner of Corrections [let alone ordinary corrections officers] that the mere use of the hitching post would be a constitutional violation." *Fountain* v. *Talley*, 104 F. Supp. 2d 1345, 1354 (MD Ala. 2000).

Moreover, Eighth Amendment law has not stood still since *Gates* was decided. In *Farmer* v. *Brennan*, 511 U. S. 825 (1994), this Court elucidated the proper test for measuring whether a prison official's state of mind is one of "deliberate indifference," holding that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.,* at 837. Because the Court of Appeals in *Gates* did not consider this subjective element, *Gates* alone could not have clearly established that affixing prisoners to a restraining bar was clearly unconstitutional in 1995. Also, in the face of recent Federal District Court decisions specifically rejecting prisoners' claims that Alabama prison guards violated their Eighth Amendment rights by attaching them to a restraining bar as well as a state regulation authorizing such conduct, it seems contrary to the purpose of qualified immunity to hold that one vague sentence plucked out of a 21-year-old Court of Appeals opinion provided clear notice to respondents in 1995 that their conduct was unlawful.

\* \* \*

It is most unfortunate that the Court holds that Officer McClaran, Sergeant Pelzer, and Lieutenant Gates are not

entitled to qualified immunity. It was not at all clear in 1995 that respondents' conduct violated the Eighth Amendment, and they certainly could not have anticipated that this Court or any other would rule against them on the basis of nonexistent allegations or allegations involving the behavior of other prison guards. For the foregoing reasons, I would affirm the judgment of the Court of Appeals. I respectfully dissent.