BARKETT, Circuit Judge,
concurring in part and dissenting in part (joined by DUBINA, Chief Judge, and MARTIN, Circuit Judge):[1]
The majority’s opinion today does nothing less than eviscerate the once inviolate protections historically accorded the home by the Fourth Amendment of the United States Constitution. To accomplish this task, the majority ignores the most basic, bright-line principle of the Supreme Court’s Fourth Amendment jurisprudence: that warrantless searches and seizures occurring within the unambiguous physical dimensions of the home are presumptively unconstitutional. The majority circumvents this fundamental precept occupying the very core of the Fourth Amendment by concluding, without any explanation, that an enclosed garage physically attached to a home — and sharing the home’s roof and walls — does not exist within the unambiguous physical dimensions of the home. This conclusion rests on the faulty premise that ordinary people expect that deliverymen will come into their attached, enclosed garages and that deliverymen have a right to do so, and fails to recognize that an attached, enclosed garage is no different than any other room in the house, and is thus entitled to the same blanket Fourth Amendment protections as a living room, a den, or a bedroom.
*1019 Nor can this conclusion be squared with binding precedent from both the Supreme Court and this Court clearly establishing that garages are entitled to such constitutional protection, which gave the deputies fair warning that their conduct violated the Coffins’ constitutional rights. While the majority finds a Fourth Amendment violation in this case, it does so, not by recognizing the garage’s obvious status as another room in the house, but rather by applying, without support and in conflict with Supreme Court precedent, a newly minted “totality of the circumstances” test which looks to whether its door is open or closed and whether a person has repeatedly told officers to leave it. The majority opinion upends not only the law of search and seizure but the law of qualified immunity as well.[2]

*1020
I. Background

The majority omits many facts, viewed in the light most favorable to the Coffins, that illustrate precisely why the Fourth Amendment’s bright-line rule prohibiting warrantless entry into a home is so essential. When Deputy Brandau stepped inside the Coffins’ garage, triggering the sensor to stop the door from closing, Deputy Lutz followed her into the garage, and Mrs. Coffin was told she was going to be arrested for obstruction of justice. Mrs. Coffin’s “offense” consisted of refusing the officers’ warrantless entry into her home, a right guaranteed to her by the Fourth Amendment.[3] She told the officers she was “baffled” as her husband had already been served, and attempted to enter her hallway to get the papers to show to the deputies. Unbelievably, at that point, Brandau grabbed her left arm and Lutz grabbed her right arm, standing on her bare foot and fracturing her toe. In pain, Mrs. Coffin screamed and fell to the floor. Lutz then twisted Mrs. Coffin’s right arm behind her back and attempted to handcuff her, tearing her rotator cuff. Hearing his wife scream, Mr. Coffin entered the garage, to find his wife in pain, with Lutz’s foot on her chest and her arm twisted behind her back.
As Mr. Coffin reached for his wife’s hand, Brandau shoved him back into the kitchen and threatened to shoot him with a Taser. Lutz released Mrs. Coffin, followed Brandau into the kitchen, and urged her to Taser Mr. Coffin. Worried that a Taser could kill her husband, since he had undergone a five-way bypass surgery, Mrs. Coffin rushed inside and held onto her husband, pleading with the deputies not to Taser him. Ignoring that plea, Brandau shot Mr. Coffin with the Taser. Lutz then grabbed Mrs. Coffin and threw her into the adjacent laundry room, causing her to fall on her hip. Mrs. Coffin got up to reenter the kitchen as Mr. Coffin was retreating towards the laundry room because Brandau, having already shot him with her Taser, was hitting him in the stomach with her baton. Stumbling back, Mr. Coffin fell into Lutz, who in turn fell back into Mrs. Coffin, causing all three to fall in a pile on top of one another in the laundry room. For the next several minutes, Brandau stood over Mr. Coffin and continued to swing her baton at him, inadvertently striking Lutz in the head. Mr. Coffin, who had his hands up trying to protect himself, eventually managed to separate Brandau from her baton, at which point Brandau left and went into the garage. Mr. Coffin walked into the kitchen, placed the baton on the counter, and sat down on the floor. Lutz then got to his feet and stood over Mrs. Coffin in the laundry room and, with “fire in his eyes,” put his gun to her head and cocked it. Hearing the door open again, Mrs. Coffin yelled, “he’s got a gun! He’s got a gun!” Another officer entered *1021 the room, said “hey, hey, hey,” to Lutz, and took the gun from Lutz’s hands. Other officers arrived on the scene and the Coffins were both arrested.[4]

II. The Deputies’ Warrantless Entry Into The Coffins’ Garage Violated Their Clearly Established Constitutional Rights

At “the very core” of the Fourth Amendment is “the right of a man to retreat into his own home and there be free from unreasonable government intrusion.” Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961); see United States v. U.S. Dist. Court, 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) (explaining that “physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed”). While the Fourth Amendment protects an individual’s reasonable expectation of privacy from government intrusion in a variety of settings, “[i]n none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual’s home.” Payton v. New York, 445 U.S. 573, 589, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Thus, “the Fourth Amendment has drawn a firm line at the entrance to the house,” id. at 590, 100 S.Ct. 1371, and “any invasion of the structure of the home, ‘by even a fraction of an inch,’ [is] too much,” Kyllo v. United States, 533 U.S. 27, 37, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (quoting Silverman, 365 U.S. at 512, 81 S.Ct. 679) (emphasis added).
Here, the undisputed facts demonstrate that the Coffins’ attached garage was part of “the unambiguous physical dimensions of [their] home,” Payton, 445 U.S. at 589, 100 S.Ct. 1371.[5] The garage was not a separate building; it was not a porch with open sides or a carport, likewise open on all sides. Rather it was part of the footprint of the house, completely enclosed by the contiguous, exterior walls of the house and covered by the same roof. See Appendix (picture of the Coffins’ home). Like the front door, the automatic garage door could be closed and locked to prevent entry by trespassers. And because it contained a doorway leading to the other rooms, it was unnecessary to exit the house in order to go from the garage to any other room or vice versa. Accordingly, there is “no reason to distinguish [the Coffins’ attached] garage, where [they] spend time, work, and store their possessions, from [their] den or [their] kitchen, where [they] spend time, work, and store their possessions. Simply put, a person’s garage is as much a part of his castle as *1022 the rest of his home.” United States v. Oaxaca, 233 F.3d 1154, 1157 (9th Cir. 2000).[6]
Indeed, by failing to recognize that an attached garage is simply another room in the house, the majority ignores the realities of modern day American society. Garages are now commonly put to a wide variety of intimate uses; for instance, Americans across the country are using attached garages as parking spaces, gyms, work spaces, laundromats, recording studios, storage facilities, and game rooms. In this respect, an attached, enclosed garage within the building’s footprint is no different than, say, a bedroom used only for storage. Because these areas exist within the unambiguous physical dimensions of the home, the use to which they are put (or not put) is constitutionally irrelevant: the Fourth Amendment recognizes without qualification that, within those physical dimensions, “all details are intimate details.” Kyllo, 533 U.S. at 37, 121 S.Ct. 2038.
Nor is it constitutionally relevant whether a room within these dimensions happens to be visible to outsiders. Under Supreme Court precedent, which the majority ignores, the fact that the Coffins’ garage door was open is legally irrelevant. In Payton, police officers saw one of the defendants sitting in bed through his open apartment door, entered without a warrant, and arrested him. 445 U.S. at 578, 100 S.Ct. 1371. Although the officers had probable cause to arrest the defendant for armed robbery, the Court reversed the conviction because the officers had crossed the threshold of his home without a warrant. Id. at 576, 603, 100 S.Ct. 1371. Thus, Payton unambiguously held that the Fourth Amendment prohibits law enforcement officials from entering the unambiguous physical dimensions of the home without a warrant, whether its door is open or shut. Id. at 589-90, 100 S.Ct. 1371.
Because the Coffins’ attached garage, like the Payton defendant’s bedroom, existed within the unambiguous physical dimensions of the home, the Fourth Amendment protected it, as a matter of law, even though the deputies could see inside. The deputies, therefore, violated the Fourth Amendment by crossing its threshold and arresting Mrs. Coffin inside.
Validating this point, several Supreme Court and Eleventh Circuit cases have recognized that the Fourth Amendment protects an attached garage just as it does any other room in the house. In Kyllo, the Supreme Court held that a thermal-imaging scan detecting “that the roof over the garage and a side wall of [the] petitioner’s home were relatively hot compared to the rest of the home and substantially warmer than neighboring homes” constituted a warrantless search of the home in violation of the Fourth Amendment. 533 U.S. at 30, 121 S.Ct. 2038 (emphasis added). As its reliance on Payton shows, id. at 40, 121 S.Ct. 2038, the Court treated Kyllo’s attached garage as a part of his *1023 home, and thus clearly established that the Fourth Amendment applies to an attached garage in the same way it applies to any other room in the home.
The majority disregards Kyllo because it reads the “sidewall of petitioner’s home” language as meaning that the unreasonable search was conducted in a part of the home un-associated with the garage, and because the word “garage” appears only once in the opinion. These attempts at distinguishing Kyllo do not withstand careful scrutiny.
First, the majority is incorrect in reading the Supreme Court’s reference to a “side wall” to mean that the hot spot revealed by the thermal imaging scan was some part of Kyllo’s home other than his garage. The scan indicated that Kyllo “had been using halide lights to grow marijuana in his house,” 533 U.S. at 30, 121 S.Ct. 2038; and since the only room mentioned as being relatively hot was the garage, and a growing operation with lamps and plants obviously cannot be located within a wall, the only logical way to read the opinion is that the scan revealed that Kyllo had been growing marijuana in his garage. As such, regardless of whether the scan also obtained evidence from other parts of Kyllo’s home, the Court had to consider the lawfulness of the scan of the garage, because that is where the evidence at issue was obtained, and the Court’s holding — that the thermal imaging scan was an unconstitutional search because it obtained evidence regarding the interior of the home — was clearly and necessarily premised on the legal conclusion that the garage was entitled to the protections accorded the home by the Fourth Amendment. See id. at 40, 121 S.Ct. 2038. Indeed, the fact that the Supreme Court, applying Payton, analyzed the search of the garage no differently than the search of the rest of the house, and ultimately ruled that the evidence from the garage was unlawfully obtained, demonstrates that it considered the garage a part of the home.
Moreover, the fact that the word “garage” appears only once in Kyllo actually supports the proposition that a garage must be considered a part of the home for Fourth Amendment purposes. It shows that there was no need for some elaborate analysis equating a garage with a home. Thus, the majority has no valid basis for disregarding Kyllo, and for concluding that Payton's, bright-line rule prohibiting warrantless entry into the home does not apply here.
Another case, squarely on-point, is the former Fifth Circuit’s decision in Kauz v. United States, 95 F.2d 473 (5th Cir.1938).[7] In that case, the defendant moved to suppress testimony from officers who entered and searched the defendant’s garage without a warrant. Id. at 473-74. Like the Coffins’ garage, the garage in Kauz was part of the same building that housed the defendant’s living quarters, had a door leading to the living quarters, and had a sliding door that opened onto the street. Id. at 473. When the officers arrived at the building, the garage’s sliding door “was open about three feet.” Id. at 474. As the deputies did here, one of the officers entered the open garage and arrested a co-defendant. Id. Someone then closed the sliding door, just as Mrs. Coffin did. Id. Nonetheless, a second officer forced his way into the garage, through the defendant’s living quarters, and once inside, “detected the smell of moonshine whisky, which [the officer] thought came from re *1024 cently broken jugs.” Id. Holding that the officers’ search of the defendant’s premises violated her constitutional rights, the former Fifth Circuit concluded that “the testimony of the officers as to what they saw in the garage was ... inadmissible.” Id. (emphasis added). Significantly, the Court did not restrict its ruling to the testimony of the officer who forced his way into the garage through the defendant’s living quarters, but also held that the officer who entered the attached garage when the door was open violated the defendant’s constitutional rights. Because the deputies did the same thing here, Kauz controls this case.[8]
Indeed, even when it is unclear whether a garage is attached or not, the case law is unambiguous that a warrantless entry into a garage is constitutionally prohibited. First, there is the Supreme Court’s decision in Taylor v. United States, 286 U.S. 1, 52 S.Ct. 466, 76 L.Ed. 951 (1932). In that case, the Court held that Prohibition agents violated the Fourth Amendment when they seized liquor from a “garage adjacent to [a] residence” without a warrant. Id. at 3, 52 S.Ct. 466. The garage was “a small metal building” that was “on the corner of a city lot and adjacent to the dwelling in which petitioner Taylor resided.” Id. at 5, 52 S.Ct. 466. The Court held that the garage was protected by the Fourth Amendment as “part[ ] of the same premises [as the residence].” Id. at 5, 52 S.Ct. 466 (emphasis added).[9]
Likewise, in United States v. Sokolow, 450 F.2d 324, 325-26 (5th Cir.1971), the former Fifth Circuit specifically held, without qualification, that an officer’s warrant-less entrance into the defendant’s garage violated the Fourth Amendment. In that case, a police officer observed air conditioning units inside of the defendant’s garage that he suspected were stolen. Id. at 325. The contents of the garage, like those of the Coffins’ garage, were visible from the outside. Id. Like the deputies did in this case, the officer entered the garage without a warrant. Id. This Court held that the officer could not enter the defendant’s garage without a warrant and suppressed the evidence obtained from the unconstitutional entry. Id. at 326. Thus, the case stands for the proposition that the Fourth Amendment prohib *1025 its entry into a residential garage, regardless of whether officers could see inside it.[10]
The majority asserts that the authority discussed above does not control this case because a “number of competing doctrines” must also be considered, and lists (1) “the Dunn curtilage factor analysis,” and (2) “areas impliedly open to public use.” Maj. Op. at 1017. Like Cinderella’s step-sisters, the majority attempts to shoehorn these inapplicable “doctrines” forcefully into this case, despite the clear misfit.
The first doctrine the majority mentions — curtilage—is wholly inapplicable because inherent in the very definition of curtilage is that it applies only to land outside, or structures existing apart from, the actual dwelling. The purpose of curtilage analysis is to determine whether the area or structures outside the residence should be given the same Fourth Amendment protection accorded the residence, not whether certain rooms within the four walls of the residential structure enjoy the same Fourth Amendment protection as other rooms within that structure. See United States v. Dunn, 480 U.S. 294, 300-03, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987) (analyzing whether areas surrounding a barn were curtilage). “The curtilage concept originated at common law to extend to the area immediately surrounding a dwelling house the same protection under the law of burglary as was afforded the house itself.” Dunn, 480 U.S. at 300, 107 S.Ct. 1134 (emphasis added). As further explained in Dunn:
In defining the terms “mansion or dwelling house,” Blackstone wrote that “no distant barn, warehouse, or the like are under the same privileges, nor looked upon as a man’s castle of defence.... ” 4 W. Blackstone, Commentaries 225. Blackstone observed, however, that “if the barn, stable, or warehouse, be parcel of the mansion-house, and within the same common fence, though not under the same roof or contiguous, a burglary may be committed therein; for the capital house protects and privileges all its branches and appurtenances, if within the curtilage or homestall.” Ibid.
Id. at 300 n. 3, 107 S.Ct. 1134 (emphasis added). Thus, a dwelling was defined at common law as the home and all areas “under the same roof or contiguous,” like the Coffins’ garage, while curtilage was defined as the structures “within the same common fence.”[11] There is not a single Supreme Court, Eleventh Circuit, or Florida Supreme Court case applying the curtilage doctrine to a room under the same roof and within the contiguous walls of the house. Indeed, doing so would be inconsistent with Payton’s bright-line and un *1026 ambiguous rule that the “threshold [of a home] may not reasonably be crossed without a warrant.” 445 U.S. at 590, 100 S.Ct. 1371. Even in Dunn, the Supreme Court assumed that the actual “barn enjoyed Fourth Amendment protection and could not be entered and its contents seized without a warrant.” 480 U.S. at 303, 107 S.Ct. 1134. In holding that the officers did not violate the Fourth Amendment by peering into the barn from an open field, it emphasized that “the officers never entered the barn, nor did they enter any other structure on respondent’s premises.” Id. at 304, 107 S.Ct. 1134. Thus, Dunn provides no support for the proposition that police may enter, as opposed to peer inside, a residential structure when its door is open.
As to the “competing doctrine” of “areas impliedly open to public use,” the majority relies upon general statements from a treatise and several cases from intermediate appellate courts involving facts so far removed from those of this case that they have no relevance here. They address areas outside the four walls of a home, such as open walkways and driveways leading up to the home, porches with no enclosed walls outside the house, and carports with no walls at all. Maj. Op. at 1010-11 (citing 1 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(f) (4th ed.2004) (walkways, driveways, porches), State v. Detlefson, 335 So.2d 371, 372 (Fla.Dist.Ct.App.1976) (front porch that was open and visible to people on the street), and State v. Duhart, 810 So.2d 972, 973-74 (Fla.Dist.Ct.App.2002) (carport that was open and exposed to public view, expressly distinguished from a garage, and likened to a front porch)).[12] None of these treatises or cases address an attached, enclosed garage that is within the building’s footprint, and under the same roof as the house. Such a garage is nothing like a walkway, driveway, front porch, or carport, all of which are outside the house and lack walls.
Perhaps the majority focuses on this so-called doctrine of “areas impliedly open to public use” because it believes that the “doctrine” somehow supports its central premise that people reasonably expect deliverymen to enter their attached, enclosed garages and that deliverymen have a right to do so. This premise, however, is unrealistic and unwarranted. I believe that most Americans do not expect, and would not permit, strangers, including deliverymen, to enter and roam through their attached, enclosed garages. The majority cites no authority for its assertion that deliverymen have the right to enter an attached, enclosed garage without consent. Indeed, it is unlawful in Florida to enter a residential garage without the owner’s permission. G.D. v. State, 557 So.2d 123, 124 (Fla.Dist.Ct.App.1990) (holding that there “was sufficient evidence to support the adjudication for trespass to the unoccupied dwelling in the garage” when defendant entered the garage of a vacant house without the owner’s permission).
In holding that these “competing doctrines” apply, the majority ignores Pay-ton’s bright-line rule prohibiting warrant-less entry into the home and effectively removes the Supreme Court’s presumption *1027 that individuals have a protected expectation of privacy in their homes. Under the majority’s opinion, instead of the presumption of privacy in the home, individuals will bear the burden of showing that they have a reasonable expectation of privacy in each separate room in their home, requiring them to keep every door shut and every curtain drawn in order to secure the protections of the Fourth Amendment within them homes. This ruling strikes at “the very core” of the Fourth Amendment. Silverman, 365 U.S. at 511, 81 S.Ct. 679.

III. The Law of Qualified Immunity

Not only does the majority erode the protections of the Fourth Amendment, but, in holding that the Coffins’ constitutional rights were not clearly established, it also distorts the law of qualified immunity in several ways. First, in relying upon dissents, even from other circuits, as well as opinions from intermediate state appellate courts, Maj. Op. at 1012-13, 1015, the majority appears to abrogate, in a one-sided way, our well-established rule that limits the relevant universe of cases for qualified immunity purposes to those of the United States Supreme Court, Eleventh Circuit, and highest court of the pertinent state. Marsh v. Butler Cnty., 268 F.3d 1014, 1032 n. 10 (11th Cir.2001) (en banc). While the majority appears to still require § 1983 plaintiffs to follow our prior rule to prove that their rights were clearly established, it now permits defendants to rely on the opinions of any jurist in any jurisdiction to prove that the law was not clearly established. See Maj. Op. at 1009 n.12 (“[Ojpinions from other courts can suggest that reasonable jurists would not know that certain factual situations rise to the level of constitutional violations, and therefore reasonable officers would not either.”); id. at 1016 (relying on “indications from jurists in non-binding cases” and intermediate state appellate court decisions “of which the deputies may well have been aware” to conclude that the Coffins’ rights were not clearly established). This double standard makes no sense. The basis for restricting our focus to binding case law is that “[w]e do not expect public officials to sort out the law of every jurisdiction in the country.” Marsh, 268 F.3d at 1032 n. 10. Now, apparently, we assume that public officials will search through the law of every jurisdiction, and only pay attention to those cases that support the position they want to take — even if it’s from a dissent![13]
The majority also distorts qualified immunity law by declaring that it will be exceedingly “rare” for a general constitutional rule to apply with obvious clarity to a defendant’s conduct in § 1983 cases alleging a Fourth Amendment violation. Maj. Op. at 1014-15. The decisions the majority cites simply do not say that. Instead, the decisions stand for the unremarkable proposition that the question of whether a particular expectation of privacy is reasonable often is fact intensive. But here, the Coffins’ claims do not require a fact-intensive analysis. Payton’s bright-line rule prohibiting warrantless entry into the home applies with obvious clarity to the deputies’ warrantless entry into the Coffins’ home.
Finally, the majority’s hyper-technical and counterfactual reading of Kyllo, Kauz, *1028 Sokolow, and Taylor contravenes the standard set forth in Hope v. Pelzer, 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002), for determining whether binding precedents clearly established a constitutional right. In Hope, the Supreme Court chastised this court for imposing an unduly rigid gloss on the clearly established prong of the qualified immunity standard. Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1277 (11th Cir.2004) (“This circuit was recently chastised by the Supreme Court for taking an unwarrantedly narrow view of the circumstances in which public officials can be held responsible for their constitutional violations.”). Overruling this Court’s standard, which had required that the facts of previous cases be materially similar to the facts of the case before the Court, the Supreme Court held that a right is clearly established when, “despite notable factual distinctions between the precedents relied on and the cases then before the Court ... the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.” Hope, 536 U.S. at 740, 122 S.Ct. 2508 (internal quotation marks omitted). Applying the proper standard, the Supreme Court concluded that two of our prior precedents gave the Hope defendants fair warning that handcuffing prisoners to a hitching post for seven hours was constitutionally impermissible, despite the fact that one case addressed several forms of punishment, including handcuffing inmates to cells or fences (as opposed to hitching posts) for prolonged periods of time, and the other case’s broad premise (as opposed to its specific holding) was that, in general, physically abusing a prisoner for past misconduct would violate the Eighth Amendment. Id. at 742-44, 122 S.Ct. 2508. This Court’s contrary conclusion “expose[d] the danger of a rigid, overreliance on factual similarity.” Id. at 742, 122 S.Ct. 2508.
In this case, the applicable binding precedents are even more factually similar to the deputies’ conduct than the precedents in Hope were to the prison officials’ conduct, and thus gave the deputies fair warning that their conduct violated the Coffins’ constitutional rights. The garage, like every other room in the Coffins’ home, was within the confines of the home, and Pay-ton says that officers cannot put one foot into the confines of a home without a warrant; Kyllo held that a warrantless search of a garage violates the Fourth Amendment; and Kauz, Sokolow, and Taylor held that entering a garage without a warrant violates the Fourth Amendment. There is nothing unclear or confusing about the straightforward holdings of these cases. The majority ignores the language and holdings of these cases, and seizes upon irrelevant, hypothetical facts and legal theories that were neither mentioned nor considered in any of these cases to say that they did not provide fair notice that entering an attached, enclosed garage without a warrant violates the Fourth Amendment.[14] Simply put, the majority does exactly what the Supreme Court chastised this Court for doing in Hope. Reading these cases on their own, ordinary people, and especially reasonable officers, *1029 would understand clearly that an attached, enclosed garage is protected by the Fourth Amendment.
[[Image here]]
The Coffins’ Home[15]
HULL, Circuit Judge,
concurring in part and dissenting in part (joined by MARTIN, Circuit Judge):[1]
In my view this is an open-and-shut case, not an “open garage” case.
First, I agree with Judge Barkett’s description of these key, undisputed facts:
[T]he Coffins’ attached garage was part of “the unambiguous physical dimensions of [their] home,”.... The garage was not a separate building; it was not a porch with open sides or a carport, likewise open on all sides. Rather it was part of the footprint of the house, completely enclosed by the contiguous, exterior walls of the house and covered by the same roof. See Appendix (picture of the Coffins’ home). Like the front door, the automatic garage door could be closed and locked to prevent entry by trespassers. And because it contained a doorway leading to the other rooms, it was unnecessary to exit the house in order to go from the garage to any other room or vice versa.
Barkett, J.,
concurring in part and dissenting in part, at 44 (second alteration in original).
Second, I recognize that the majority focuses on a difficult open-door question. However, we need not resolve the open-door issue because, as I understand the undisputed facts, Plaintiff Mrs. Coffin had already refused the Defendants entry at her front door, had pushed the automatic button to close her garage door, and her garage door was closing before Defendant Deputy Brandau’s entry.
Mrs. Coffin had completed what she needed to do to close her door. Indeed, the deputies were standing about five feet from the garage when Mrs. Coffin pushed the automatic button to shut her garage door. Seeing that the garage door was closing, Defendant Brandau stepped into the garage, breaking the electronic-eye safety beam for the door and causing the *1030 garage door to retreat to its open position. Mrs. Coffin had effectively closed her garage door and Defendant Deputy Brandau opened it back up by breaking the electronic beam and stopping its closing. Defendant Deputy Lutz witnessed this act. Brandau entered the garage; Lutz followed.
In short, the deputies violated Mrs. Coffin’s Fourth Amendment rights when they entered her closed garage door, and the Fourth Amendment law was clearly established that the deputies could not enter Mrs. Coffin’s home after she closed the door. See Vinyard v. Wilson, 311 F.3d 1340, 1355 (11th Cir.2002) (considering the plaintiffs version of the events and concluding the “obvious clarity” standard, although difficult to meet, was satisfied in relation to the clearly established law issue).
MARTIN, Circuit Judge,
concurring in part and dissenting in part (joined by DUBINA, Chief Judge):[1]
I fully concur in Judge Barkett’s dissenting opinion because the Fourth Amendment rights the Deputies violated here were clearly established. I write separately only to emphasize that just as Mr. and Mrs. Coffin have been denied relief for this intrusion into their home, the “totality of the circumstances” test established in the majority opinion does nothing to protect people in their homes from similar intrusions in the future. Specifically, the indefinite standard established by the court today reduces to one the clearly established circumstances under which a person can prevent law enforcement from entering her garage, attached to her home, even where the officer has no warrant, and where the homeowner actively protests the entry.
The “firm line” that the Fourth Amendment draws at the entrance of the house “must be not only firm but also bright.” Kyllo v. United States, 533 U.S. 27, 40, 121 S.Ct. 2038, 2046, 150 L.Ed.2d 94 (2001). Before today, our binding precedent, which established that an attached garage is treated as part of the “house” under the Fourth Amendment, drew a firm and bright line. But rather than apply Kyllo’s bright line rule, the majority now sets a standard that relies on a number of context-specific and circumstance-dependent factors. In doing so, this court has stripped the Coffins of the very rights that the Fourth Amendment was intended to protect.
Until today, “any physical invasion of the structure of the home, ‘by even a fraction of an inch,’ was too much.” Kyllo, 533 U.S. at 37, 121 S.Ct. at 2045. But now in this Circuit, neither police nor citizens have advance notice of the bounds of the Fourth Amendment. What will happen in the next case? For example, if a person who normally keeps the door of her attached garage closed is slow to close it upon her return from work at 6:30 p.m., is law enforcement now free to dart into the momentarily open door? Is law enforcement allowed to then go through the garage into the house? The shifting standard established here not only muddles our Fourth Amendment jurisprudence, but threatens to strip the home of its sanctity. Indeed, I fear that this case may present the first of many unconstitutional entries into homes that are no longer prohibited by clearly established law. For this reason, in addition to those set out by Judge *1031 Barkett in her dissent, I respectfully dissent from the majority opinion.

. Although I believe that this case should be resolved on the ground that the Coffins relied upon — that the deputies’ warrantless entry into the Coffins’ home violated the Coffins’ clearly established constitutional rights, regardless of whether the deputies had probable cause to arrest Mrs. Coffin — I also believe that the majority's exposition of Florida law on the probable cause issue is just wrong. Despite the fact that this issue was not squarely before this en banc Court, the majority goes far out of its way to decide that probable cause for the arrest existed. Nothing in Florida law comes close to supporting this proposition.
The majority reaches the untenable conclusion that Mrs. Coffin reasonably appeared to obstruct justice merely by failing to open the front door of her house. Maj. Op. at 1008-09. But "[t]he threshold for establishing the commission of [obstruction] under [§ 843.02, Fla. Stat.] is that the officer be in the ‘lawful execution’ of a ‘legal duty.’ To meet this threshold, the conduct of the officer must be consistent with the Fourth Amendment....” C.E.L. v. State, 995 So.2d 558, 560 (Fla.Dist. Ct.App.2008), aff'd, 24 So.3d 1181 (Fla.2009). Under the Fourth Amendment, the deputies could not have lawfully required Mrs. Coffin to open her front door because they did not possess a warrant of any sort. See Kentucky v. King, 563 U.S. -, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011) ("When law enforcement officers who are not armed with a warrant knock on a door.... the occupant has no obligation to open the door or to speak.”); United States v. Tobin, 923 F.2d 1506, 1512 (11th Cir. 1991) (en banc) (recognizing that the occupants of a house are "free to deny [an officer’s] request [to enter] and alternatively talk to the [officers] through a closed door” when the officers lack a warrant). Thus, Mrs. Coffin's failure to open her door did not obstruct the lawful execution of a legal duty; she merely exercised her Fourth Amendment rights. Cf. Rodriguez v. State, 964 So.2d 833, 837 (Fla.Dist.Ct.App.2007) (holding that individual did not commit obstruction by telling the deputy to get off his property and retreating to his house when the "deputy had only attempted to engage him in a consensual citizen encounter”); H.H. v. State, 775 So.2d 397, 398-99 (Fla.Dist.Ct.App.2000) (not obstruction to flee when the officers had no authority to detain individual); R.S. v. State, 531 So.2d 1026, 1026-27 (Fla.Dist.Ct.App. 1988) (not obstruction to refuse to answer questions when officers had no authority to demand an answer). The majority’s response to this basic tenet of constitutional law is that "the Deputies here did not enter the home; rather they entered an open garage to access and knock on the visible door to the kitchen.” Maj. Op. at 1009 n.12. But this response confuses the point. Whether the deputies violated the Fourth Amendment by entering the garage, while central to the rest of this case, is a separate question from whether they had probable cause to arrest Mrs. Coffin for obstructing justice. As they lacked the authority to compel Mrs. Coffin to open any door of her home, her failure to open the front door and attempt to close the garage door, regardless of the constitutionality of the deputies subsequent entry into the garage, could not have constituted obstruction of justice because she had a Fourth Amendment right to do what she did.
Moreover, Florida law makes clear that, despite Mrs. Coffin’s failure to physically take the restraining order from the deputies' hands, the deputies could have nonetheless effectively served process by leaving the restraining order in the mailbox or on the front doorstep. See Liberman v. Commercial Nat’l Bank of Broward Cnty., 256 So.2d 63, 64 (Fla.Dist.Ct.App.1971) (mail box); Haney v. Olin Corp., 245 So.2d 671, 672-74 (Fla.Dist. *1020 Ct.App.1971) (front doorstep). Recognizing this point, the majority asserts that a restraining order is somehow a distinct form of legal process that must be physically placed in the intended recipient's hands. That assertion, however, finds no support in Florida law. See, e.g., Top Dollar Pawn Too, Inc. v. King, 861 So.2d 1264, 1265-66 (Fla.Dist.Ct.App. 2003) (applying general service-of-process law to service of a temporary restraining order); Palamara v. World Class Yachts, Inc., 824 So.2d 194, 195 (Fla.Dist.Ct.App.2002) (holding that defendant had been "personally served” when process server left process on defendant's door); see also Fla. R. Civ. P. 1.070 (governing "personal service” of initial pleadings and court orders). Thus, Mrs. Coffin’s failure to open her front door could not have constituted obstruction of justice. The majority's conclusion that the deputies had probable cause to arrest her runs contrary to both Florida law and the sanctity of the home.

. No statute or case law permits uninvited entry into a home to serve a civil injunction. The majority cites none and I have found none.

. After an internal affairs investigation, the deputies were found to have violated the Sarasota Sheriff's Department’s general order requiring conformity to the law, and were suspended without pay for 160 hours and ordered to complete remedial training relating to search and seizure law. On administrative appeal, the allegations against the deputies were sustained, but their penalty was reduced to 40 hours suspension without pay and no remedial training!

. The majority’s rationale for disregarding Payton is that it "did not involve a garage at all.” Maj. Op. at 1010. But this reasoning ignores the “unambiguous physical dimensions of the home” language in Payton. The Supreme Court expressly held that the police may not, without a warrant, cross the threshold of any room that falls within the "unambiguous physical dimensions of the home,” period. 445 U.S. at 589, 100 S.Ct. 1371. But under the majority's reasoning, the police may cross the threshold of any room within the unambiguous physical dimensions of the home, so long as that type of room was not expressly discussed in Payton. Thus, according to the majority, the police may enter, for instance, a den, kitchen, or basement, despite the fact that it falls within the unambiguous dimensions of the home. This conclusion simply cannot be squared with Payton.

. None of the features of a garage that the majority identifies, Maj. Op. at 1012-13, provides any justification for distinguishing an attached, enclosed garage from the rest of a home. Opening any door, or even a window, exposes the interior of a home to public view, just as opening a garage door does; and regardless of the garage door's relative size, it, like any other door to a house, can be closed to maintain privacy and prevent others from entering. Indeed, the fact that a garage door may be larger than a front door and opening it may reveal more of a home's contents cannot be decisive, because that would mean that having a large front door, or sliding glass door, or even large open window that passes some undefined and arbitrary size threshold would strip the entire house of Fourth Amendment protection. Surely, no authority supports this necessary and absurd implication of the majority’s position.

. In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

. The majority speculates that the interior door connecting the residence to the garage might not have been visible from the street. But it would be illogical to strip a garage of Fourth Amendment protection when officers can see such a door, because the existence of the door only supports the conclusion that an attached, enclosed garage is indistinguishable from any other room in the home also containing such a door. Under the majority's reasoning, if officers can see a door connecting a bedroom, den, or kitchen to the rest of the home, they may enter the room to access other parts of the home. Nothing in logic or authority supports this conclusion.
Likewise, contrary to the majority’s assertion, Kauz cannot be distinguished on the ground that the garage in that case was “only” open three feet. Maj. Op. at 1011. The three-foot opening was indisputably large enough for the officers in Kauz to enter the garage and see inside, which is the critical fact according to the majority.
Finally, the fact that the Court focused more on the officer who entered the defendant’s living quarters does not change the fact that the Court’s holding was that the officer who entered the garage directly through the open door also violated the Fourth Amendment. The Court’s holding, not the structure of its opinion, is all that matters.

. The majority attempts to distinguish Taylor on the ground that the garage in that case was closed. That distinction, however, is irrelevant under Payton, as discussed above, and also ignores the undisputed fact that Mrs. Coffin had attempted to close her garage door. Just as the officers in Taylor forced their way into the garage by breaking a lock, the deputies here forced their way into the Coffins’ garage by triggering an electronic sensor when the door was closing.

. As with Kauz, it is irrelevant whether the garage in Sokolow might have lacked a visible passageway to another door of the home. Nor it relevant under Payton whether the garage door was open or closed. While the majority speculates about these facts in an attempt to distinguish Sokolow, the holding of the case remains clear that entering a residential garage without a warrant is constitutionally impermissible.

. Ignoring this well-established understanding of the curtilage doctrine, the majority asserts that the fact that the Coffins’ attached garage was open provides a reason to apply the curtilage doctrine here. But this reasoning is circular. That the garage was open would have been a relevant consideration only if the curtilage doctrine applied, see Dunn, 480 U.S. at 301, 107 S.Ct. 1134, but it begs the question to also use that fact as reason to decide that the curtilage doctrine is applicable to begin with; in other words, the fact that an area is observable to people passing by is one of the four factors identified in Dunn for distinguishing between an open field and curtilage, so it is circular to simultaneously rely on that fact to justify applying the four-factor test in the first place.

. The majority also cites this Court’s decision United States v. Taylor, 458 F.3d 1201, 1204 (11th Cir.2006), Maj. Op. at 1011, which addressed the permissibility of approaching a residence and knocking on the front door, not crossing the threshold of a structure and performing a search or seizure. This " ‘knock and talk' exception to the Fourth Amendment’s requirement for a warrant,” 458 F.3d at 1205, would only apply to Deputy Lutz’s initial approach to the Coffins’ front door, not the deputies' subsequent entry into the garage and seizure of Mrs. Coffin.

. Contrary to the majority’s assertion, Denno v. Sch. Bd. of Volusia, Cnty., Fla., 218 F.3d 1267 (11th Cir.2000), cannot support its reliance on dissents and non-binding precedents, because Denno pre-dates our en banc decision in Marsh, 268 F.3d at 1032 n. 10, which restricted our focus to "decisions of the U.S. Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state” when determining whether a right was clearly established.

. As noted, the majority focuses on the extent to which the garage in Kauz was open, and speculates that the garage might have lacked a visible passageway to the rest of the home, even though the decision never says so; it likewise speculates that the garage in Sokolow might have been closed and also lacked a visible passageway to the house, even though, again, the decision never says so; it faults Kyllo for mentioning the word "garage” only once and incorrectly assumes that the relevant search was conducted in a part of the house separate from the garage; and it disregards Taylor because the garage in that case was closed, even though the decision does not expressly rely on the fact that the door was closed.

. Dist. Ct. Docket Entry 44-5 (Ex. D-Photograph of Coffins' Home).