[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-14257
Non-Argument Calendar
_____

D.C. Docket No. 1:11-cv-23547-CMA


ROBERT EUGENE EASLEY,

Plaintiff-Appellant,

versus

DEPARTMENT OF CORRECTIONS, et al.,
Secretary,

Defendants,

WARDEN,
COLONEL MARLOW,
SGT. VEGA,
SGT. REYES,
SGT. ORTERO, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____
(October 24, 2014)

Before HULL, ROSENBAUM, and JULIE CARNES, Circuit Judges.

PER CURIAM:

In this 42 U.S.C. § 1983 action, plaintiff-appellant Robert Eugene Easley, a Florida prisoner, pro se appeals the district court's entry of summary judgment in favor of 15 defendant-appellee prison employees. Easley alleged that he received inadequate medical treatment and faced retaliation for filing grievances. On appeal, Easley argues the district court erred (1) by prematurely granting summary judgment in the defendants' favor where further discovery beyond the deadline was needed and (2) by failing to grant summary judgment in Easley's favor. After careful review, we find no reversible error and affirm.

## I. BACKGROUND

### A.  The Parties

In 2011, this lawsuit began, and by January 2012, Easley pro se had filed an amended § 1983 civil rights complaint against 15 employees of the Dade Correctional Institution ("DCI"). The defendants may be divided into three categories: (1) DCI Healthcare Providers, (2) DCI Officers, and (3) DCI Officials. In the first category, Easley alleges deliberate indifference to his serious medical needs by Dr. Julio Poveda and Nurses Curtis Dwares, Suzanne Manifold, Wilene Laguerre, and Ron Ruel. In the second category, he alleges interference with his access to medical care by DCI Sergeants Michelle Vega, Linessa Reyes, Jose

2

Otero, Krystal Holmes, and Jenean Lee, as well as DCI Officers Toi Levy, Deatra Johnson, Anthony Alexander, Joshua Pujol, and Taniko Byrd. In the third category, he alleges unlawful retaliation for his prior grievances by DCI Officials Warden Jerry Cummings, Assistant Warden Jabaria Williams, and Colonel Royce Marlow.[1]

## B. Easley's Medical Care from 2009-2011

Easley was a DCI inmate from September 2009 until December 2011. He is now at another prison. The events below relate only to his time at DCI. Upon arrival at DCI, Easley was medically evaluated and was diagnosed as suffering from diabetes, hypertension, and chronic back pain. Subsequently, he was diagnosed with anxiety, depression, and obesity.

The DCI Healthcare Providers took a variety of steps to address Easley's medical needs. These included: (1) providing Easley with a cane, a low bunk pass, and a pass to avoid prolonged standing; (2) placing Easley on a special 2800-calorie diet to address his diabetes and weight issues; (3) referring Easley to an outside orthotics specialist and then providing Easley with special orthopedic shoes;[2] (4) securing an evaluation with an outside orthopedic surgeon, who recommended a surgical remedy for his back pain, spinal fusion surgery, which

---

[1] The Secretary of the Department of Corrections was originally a defendant but was dismissed from the case and is not a party to this appeal.

[2] Because Easley was sent multiple times to medical specialists with offices outside the prison, we refer to them as "outside" specialists or "outside" doctors.

Easley refused; (5) offering Easley the option of sleeping in the infirmary and advising that he regularly do stretching exercises; (6) ordering an MRI to aid in diagnosing Easley's back problems; (7) ordering physical therapy; (8) prescribing and administering Ultram, a narcotic, as well as aspirin and ibuprofen for relief of Easley's pain; and (9) prescribing and administering other medicines, including Lisinorpil (for high blood pressure), Glucophage (for diabetes), Zocor (for cholesterol), Flexeril (a muscle relaxer), and Diphenhydramine (Benadryl). Separately, the DCI mental health department prescribed Prozac and Elavil (or the generic, amitriptyline), both for depression.

## C. Easley's Claims Against the DCI Healthcare Providers

Easley argues the steps taken by the DCI Healthcare Providers were insufficient, delayed, or terminated, rendering his medical care inadequate.

Easley accurately notes that his special diet was twice terminated. The formal policy (of the Florida Department of Corrections) required the cessation of a special diet where an inmate missed more than 10% of his meals. Easley had missed 33% of his special diet meals when that diet was first cancelled in March 2010. It was subsequently reinstated, and then again cancelled when Easley missed 71% of his special diet meals in October 2010. The special diet was not renewed and Easley was given a disciplinary report for failure to comply.

4

After being sent to an outside orthotics specialist, Easley received special orthopedic shoes in June 2010.  Easley complains, however, that he was not given a new pair of the same shoes on an annual basis.  Defendants respond that no policy requires annual replacement of the specially ordered shoes, and that Easley was given replacement orthotic inserts in January 2011.  Moreover, as with a number of Easley's other medical treatments, the authorization or denial of replacement shoes did not rest with the individual defendants.  Rather, the defendants would file a request with Utilization Management, a division of Florida's Department of Corrections based in Tallahassee and a non-party.  In August 2011, defendant Dr. Poveda requested that Utilization Management approve Easley being seen again by an outside orthotics specialist.  Easley does not dispute that Dr. Poveda made this request, but avers that defendant Nurse Dwares "refused to properly write referrals to get a renewal pair" of orthopedic shoes.  Dwares avers that he was not "involved in [Easley] receiving or not receiving a new pair of shoes," but that Dr. Poveda did in fact make the appropriate request to Utilization Management.

The DCI Healthcare Providers referred Easley to an outside physician, Dr. Amar Rajadhyaksha.[3]  Dr. Rajadhyaksha, an orthopedic surgeon, saw Easley on

---

[3] The defendants consistently refer to this appointment as an evaluation with a neurologist, but nothing in the record indicates Dr. Rajadhyaksha is a neurologist, and his stamp in the medical records indicates that he is an orthopedic surgeon specializing in spinal surgery.

5

June 16, 2010, and recommended corrective surgery to resolve Easley's back pain. Easley refused surgery and requested other, more conservative treatment.

After Easley saw Dr. Rajadhyaksha and refused surgery, the DCI Healthcare Providers ordered outside consultations for epidural injections to block the pain. Easley met with Dr. Polanco on October 8, 2010, and with Dr. Escandor on December 22, 2010, both at Kendall Regional Medical Center ("Kendall").  In his sworn affidavit, Dr. Poveda stated that Easley received two epidural injections, one on October 8, 2010, and one on December 22, 2010.  In his affidavit, Easley avers that the epidural injections never occurred during his time at DCI.  And as Easley notes, the Kendall documents from these appointments show that Easley was seen but do not state whether epidural injections were actually administered on the alleged dates.

Nevertheless, it is undisputed that Easley's back-pain condition received significant attention.  Throughout his stay at DCI, Easley was prescribed the narcotic Ultram, to be given three times a day as needed.  Affidavits from the DCI Healthcare Providers and accompanying medical records show that he was regularly evaluated and treated by the medical staff. Several of these evaluations resulted in referral to outside specialists. In April 2010, Easley was referred to an orthopedic surgeon. That appointment, where Dr. Rajadhyaksha recommended surgery to Easley, occurred in June 2010.

6

Easley was separately evaluated by the DCI Healthcare Providers twice in July 2010.  In September 2010, Easley was sent out for an MRI and his prescription for the narcotic Ultram was renewed.  Easley was evaluated twice by the DCI Healthcare Providers again in October 2010, at least once in November 2010, and had follow-ups specifically addressing back pain management in December 2010 and February 2011.  In March 2011, Easley was recommended for and began physical therapy. [4]  Easley was evaluated for his back pain twice in April 2011 and again in May 2011.  The medical notes from the May 2011 appointment note that Easley "state[d] that the Ultram is working very well on his pain."  Medical records from May 2011 and June 2011 also show that Easley refused a referral for an outside pain management consult and again refused surgery.  Both refusal forms acknowledge that Easley refused these treatments against the advice of the DCI Healthcare Providers.[5]

Easley also complains that the DCI Healthcare Providers required him to wait eight hours between doses of Ultram, the narcotic pain reliever.  Easley's

---

[4] In the district court, Easley disputed the ready availability of physical therapy, alleging that he was improperly removed from the physical therapy program. He raises no issues related to physical therapy on appeal.

Easley's Healthcare Providers contend that the cessation of physical therapy was due to Easley's non-compliance.  Despite the therapist observing that Easley walked briskly and without his cane, Easley at times would not attend physical therapy or perform required exercises without greater access to pain medication.

[5] A separate June 2011 examination showed that Easley's treatment for diabetes, hypertension, and high cholesterol had been effective.  In his deposition, Easley acknowledged that the medications prescribed for his diabetes while at DCI brought the condition under control.

prescription allowed administration of Ultram three times a day, as needed.  The DCI Healthcare Providers admit that they did not provide Easley with Ultram on demand and required him to wait eight hours between doses.  The defendants aver that (1) Ultram is a narcotic that must be administered under direct observation and (2) standard medical practice treats a thrice-daily dose as being appropriate every eight hours, once in the morning, once in the afternoon, and once at night.  Medical records show that, in late July 2011 and early August 2011, Easley on numerous occasions attempted to get his next dose of Ultram before the prescription would allow.  Easley also consistently refused the DCI Healthcare Providers attempts to take vital signs to get an objective assessment of his pain level.  In addition, Easley was also taking Prozac at the time. The DCI Healthcare Providers aver that because Prozac can potentially have life-threatening interactions with Ultram, close monitoring was especially warranted.

Easley also makes a separate claim that he was unfairly forced to wait forty-five minutes in the medical unit after many of his Ultram doses.  The DCI Healthcare Providers respond by explaining the common practice of "cheeking" in the prison environment. Cheeking is where inmates will attempt to store medication in their cheeks and later sell their medication.  The DCI Healthcare Providers often require inmates to wait after receiving their medication to ensure the medication has dissolved.

**D. Easley's Claims Against the DCI Officers**

Separately, Easley argues that the DCI Officers denied him access to medical care by not allowing him to go to the medical unit despite his medical pass. Easley's primary claim is that the DCI Officers failed to honor his pass for "noon time" treatment. Easley's medical pass, however, never prescribed dosage of Ultram at "noon time" and the DCI Officers offer at least two explanations for appropriately denying Easley's request to go to the medical unit at noon. Either the compound was not opened up for "call outs," which would allow inmates to go to work, chapel, medical, etc., or an inmate would not be allowed to go to the medical unit at noon because the medical staff was regularly on lunch break between noon and 1:00 pm.

**E. October-November 2011 Retaliation Against Easley**

Though Easley alleges that the denial of access to medical care by the DCI Officers and the failure to provide adequate medical care by the DCI Healthcare Providers may have had a retaliatory element, he states a separate claim against the DCI Officials which sounds entirely in retaliation. Easley alleges that he was placed in administrative confinement on October 14, 2011, and then transferred from DCI to Everglades Correctional Institution on December 9, 2011, in retaliation for filing grievances as to his medical treatment at DCI.

9

In October 2011, a DCI corrections officer was assaulted in Section I of the prison (which included the DCI prison library). Because the identity of the officer's assailants was unknown, all 100 inmates present in Section I of the prison on that day, including Easley, were placed in administrative confinement.[6] The Office of the Inspector General of Florida, rather than the DCI Officials, conducted the investigation into the assault. Because the subsequent investigation could not determine the officer's assailants, all DCI prisoners then housed in administrative confinement (whose whereabouts at the time of the attack could not be confirmed) received "non-negative" transfers to other facilities for safety and security reasons.

Easley also asserts that he lost "gain time" as a result of his placement in administrative confinement. The record shows, however, that Easley received seven days (of a possible ten days) of gain time in October 2011 and that he received ten days of gain time in December 2011. Easley forfeited any gain time for November 2011 not for being placed in administrative confinement, but for receiving an unrelated disciplinary report.

## F. District Court Proceedings

---

[6] For at least two weeks in November 2011, however, Easley was not in administrative confinement, but was transferred to the South Florida Reception and Medical Center, where he was seen by Dr. Gama, a neurologist. Dr. Gama's notes from this meeting acknowledge Easley's refusal of surgery and recommend weight reduction, stretching exercises, and symptomatic pain management with ibuprofen. Though Dr. Gama also recommended another referral to pain management, he notes discussing the risks of epidural shots with Easley. Easley's deposition testimony concedes that the neurologist did not recommend epidural shots.

The district court referred the case to a magistrate judge. On December 28, 2011, the magistrate judge granted Easley's motion to proceed in forma pauperis. Following Easley's amendment to his complaint,[7] service on the defendants, and defendants' Answers, the magistrate judge issued a scheduling order stating that discovery would conclude on December 17, 2012. Defense counsel deposed Easley on November 15, 2012. Defense counsel also brought documents covered by Easley's requested discovery to the prison for Easley to review.

After the defendants responded to Easley's discovery requests, Easley filed several motions to compel. In particular, on November 26, 2012, Easley moved to compel the copying of documents presented to him in his prior meetings with defense counsel. Easley essentially requested that the Florida Department of Corrections provide these copies to him at no cost or with a bill for future payment. Easley's prison account lacked sufficient funds to pay for the copying costs. The statement of charges provided by defense counsel shows that Easley sought 923 copies, for which he would have been charged $138.45. The defendants objected, asserting that the Federal Rules did not require a party served with a request for production (or a non-party) to make copies free of charge.

---

[7] The district court directed the clerk of court to combine Easley's amended complaint and supplement into a single document, which the court stated it would treat as the operative complaint.

11

Separately, on November 1, 2012, Easley sought production of video recordings from administrative confinement, for the period of October 14, 2011 through November 2011. Easley alleges that these videos would demonstrate the involvement of the DCI Officials in the decision to place Easley in administrative confinement in retaliation for his grievances. The magistrate judge struck Easley's motion to compel for failure to comply with the local rules. On December 4, 2012, Easley filed a motion to extend the time to complete discovery by 60 days. The magistrate judge denied this motion on December 6, 2012.

Easley then moved, on December 12, 2012, for spoliation sanctions in connection with the destruction of the video recording, which he alleged was in bad faith. The magistrate judge denied the sanctions motion. Discovery expired on December 17, 2012.

On January 18, 2013, all defendants moved for summary judgment, filing affidavits, a transcript of Easley's deposition, and various exhibits. Easley also moved for summary judgment in his favor. He submitted a variety of records, including an array of grievances and grievance responses, as well as several affidavits, two from himself, several from other inmates, and one from corrections officer Sergeant Christy Sturtevant.[8] Easley also moved to strike the defendants'

---

[8] Sergeant Sturtevant's affidavit indicates that she observed Easley being returned from a failed attempt to go to the medical unit. Sturtevant filed a subsequent affidavit stating that she thought Easley was attempting to go to medical to receive insulin for his diabetes, that she was

summary judgment motions because of his inability to obtain copies of the defendants' discovery documents.

The magistrate judge issued a report and recommendation that the district court grant all defendants' motions for summary judgment and deny Easley's summary judgment motion. The district court adopted the report and recommendation, denied Easley's various motions, and granted summary judgment in favor of all defendants. Easley timely appealed.

## II. STANDARD OF REVIEW

The district court's denial of a motion to compel discovery is reviewed for abuse of discretion. Holloman v. Mail-Well Corp., 443 F.3d 832, 837 (11th Cir. 2006). "District judges are accorded wide discretion in ruling upon discovery motions, and appellate review is accordingly deferential." Harris v. Chapman, 97 F.3d 499, 506 (11th Cir. 1996).

We review de novo a district court's grant of summary judgment, viewing the evidence in the light most favorable to the non-moving party. Owen v. I.C. Sys., Inc., 629 F.3d 1263, 1270 (11th Cir. 2011). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

unaware of any back problem or back pain, and that she never confirmed with any other officer that Easley had been turned away from the medical unit.

13

56(a).  We note before addressing the merits of Easley's appeal that Easley appears pro se before this Court, as he did before the district court.  Pro se pleadings are given more leeway than complaints submitted by counseled litigants. Dean v. Barber, 951 F.2d 1210, 1213 (11th Cir. 1992).

## III. DISCOVERY

After review of the record and Easley's claims, we conclude that the district court did not abuse its discretion in not extending the discovery deadline and proceeding to rule on cross-summary-judgment motions.

Summary judgment should be granted only where the party opposing the motion has had an adequate opportunity for discovery. See Snook v. Trust Co. of Ga., 859 F.2d 865, 870 (11th Cir. 1988).  But "[w]here a significant amount of discovery has been obtained, and it appears that further discovery would not be helpful in resolving the issues, a request for further discovery is properly denied." Avirgan v. Hull, 932 F.2d 1572, 1580 (11th Cir. 1991).

As to the cross-summary-judgment motions, Easley submitted several hundred pages of records, including numerous grievances and grievance responses, medical records, gain-time reports, Department of Corrections rules, affidavits by individuals, and several of the defendants' interrogatory responses.  The defendants also filed hundreds of pages of Easley's medical and prison records.

14

Easley has not shown that the district court abused its discretion in denying

Easley's requests for further discovery beyond the discovery deadline.

This is not to say that further discovery would yield no greater development

of the factual record. But that is not the standard our law provides. "[W]e will not

overturn discovery rulings unless it is shown that the District Court's ruling

resulted in substantial harm to the appellant's case." Iraola & CIA, S.A. v.

Kimberly-Clark Corp., 325 F.3d 1274, 1286 (11th Cir. 2003) (quotation omitted).

Beyond conclusory allegations, Easley has also not shown the existence of any

additional discoverable material that would have meaningfully altered the district

court's analysis as to the summary judgment motions. See Haves v. City of

Miami, 52 F.3d 918, 921 (11th Cir. 1995) ("The mere existence of some factual

dispute will not defeat summary judgment unless that factual dispute is material to

an issue affecting the outcome of the case.").

As to the cost of copying discovery materials, Easley argues that the district

court should have put a lien on Easley's inmate account. In effect, Easley contends

that his in forma pauperis status should cover the costs of discovery. See 28 U.S.C.

§ 1915 (allowing deferred payment, from the inmate account, for court fees). But

the IFP statute does not mention the costs of discovery. Rather, § 1915 refers to

only "court fees."[9] Neither defendants nor the district court were obligated to

---

[9] Section 1915 provides, in relevant part:

15

advance Easley his discovery costs. See Tabron v. Grace, 6 F.3d 147, 159 (3d Cir. 1993) ("There is no provision in [§ 1915] for the payment by the government of the costs of . . . litigation expenses, and no other statute authorizes courts to commit federal monies for payment of the necessary expenses in a civil suit brought by an indigent litigant.").

As to the video recordings for October 14, 2011 through November 2011, the defendants state that they were not requested until September 2012 and that, at that time, such recordings no longer existed.  Nothing in the record suggests any bad faith of the defendants in not retaining videos from a year earlier. Alternatively, other than conclusory allegations, Easley has provided no explanation as to what information was in the video recordings or in the documents not copied that would have aided his case.  See Iraola, 325 F.3d at 1286.

## IV. MERITS OF EASLEY'S CLAIMS

## A.  The Deliberate Indifference Standard

For Easley to secure redress under § 1983, he must demonstrate that the defendants, acting under color of state law, committed acts that deprived him of

---

[I]f a prisoner brings a civil action or files an appeal in forma pauperis, the prisoner shall be required to pay the full amount of a filing fee. The court shall assess and, when funds exist, collect, as a partial payment of any court fees required by law, an initial partial filing fee of 20 percent of the greater of--
(A) the average monthly deposits to the prisoner's account; or
(B) the average monthly balance in the prisoner's account for the 6-month period immediately preceding the filing of the complaint or notice of appeal.

28 U.S.C.A. § 1915(b)(1).

some right, privilege, or immunity protected by the Constitution or laws of the United States. 42 U.S.C. § 1983.  The Eighth Amendment forbids "cruel and unusual punishments," U.S. Const. amend. VIII, and prohibits "deliberate indifference to serious medical needs of prisoners." Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 291 (1976).

To prevail on a deliberate indifference claim, Easley must show: "(1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1306–07 (11th Cir. 2009).  To establish deliberate indifference, Easley must prove "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." Townsend v. Jefferson Cnty., 601 F.3d 1152, 1158 (11th Cir. 2010) (alteration in original).  The defendants must have been "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and then actually draw that inference. Farrow v. West, 320 F.3d 1235, 1245 (11th Cir. 2003) (quotation omitted).

Delay in treatment may, under certain circumstances, constitute deliberate indifference. See McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999).  And "prison officials may violate the Eighth Amendment's commands by failing to treat an inmate's pain." Id. at 1257.  But "a simple difference in medical opinion

17

between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment" does not support a claim of deliberate indifference. Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991); see also Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir. 1989).  Nor do matters of medical judgment. Estelle, 429 U.S. at 107, 97 S. Ct. at 292–93.  Deliberate indifference is not established where an inmate received care but desired different modes of treatment. Hamm v. Dekalb County, 774 F.2d 1567, 1575 (11th Cir. 1985).

"Medical treatment violates the eighth amendment only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Harris, 941 F.2d at 1505 (quotation omitted). Mere incidents of negligence or malpractice do not rise to the level of constitutional violations; rather, care must be "minimally adequate." Id. at 1504. And "an inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1188 (11th Cir. 1994), overruled in part on other grounds by Hope v. Pelzer, 536 U.S. 730, 122 S. Ct. 2508 (2002).

## B. Easley's Evidence of Deliberate Indifference

Easley's evidence does create factual issues about whether he actually received epidural injections for his back pain, but his evidence does not create a

factual issue as to deliberate indifference to his multiple medical needs that would preclude summary judgment.  We explain why.

The undisputed evidence shows that, throughout his time at DCI, Easley received continuous and extensive medication and medical treatment. The DCI Healthcare Providers employed a variety of approaches to ensure that Easley's diabetes and hypertension remained under control and that Easley's back pain was effectively managed.  They regularly adjusted his treatment to compensate for the unavailability (or, in the case of surgery, Easley's refusal) of other treatment options. Certain treatment options desired by Easley were never within the authority of the DCI Healthcare Providers at the facility, but rather subject to authorization by Utilization Management in Tallahassee or limited by Department of Corrections policies.  Other treatment options, like Easley's orthotic shoes, were made available initially, but not renewed on Easley's demand.  Even if the unavailability of new shoes annually were imputed entirely to the defendants, it would be, at most, negligence rather than deliberate indifference.

At the heart of this complaint is Easley's access to prescription pain medication, the narcotic Ultram.  The availability of Ultram cuts across Easley's claims against the DCI Healthcare Providers and the DCI Officers.  Given the evidence of the standard medical dosing for this narcotic, the heightened concern about "cheeking" for safety in the prison environment, and the multiple medicines

19

Easley received, the steps taken to dispense Easley's Ultram simply do not rise to the level of deliberate indifference on the part of the DCI Healthcare Providers. While Easley strongly disagrees with his Healthcare Providers as to his treatment, this does not entitle him to relief under § 1983. See Harris, 941 F.2d at 1505; Hamm, 774 F.2d at 1575.

Finally, there is no evidence that the DCI Officers, who allegedly denied Easley access to the medical unit, had any awareness of a risk of serious harm to Easley if they did not let him pass at a particular time to obtain Ultram. Rather, the evidence shows that the DCI Officers, like the DCI Healthcare Providers, were constrained by institutional controls and did not bend those controls in response to Easley's demands for pain medication on his own terms and schedule.

## C. Retaliation

As with deliberate indifference, Easley's retaliation claim must show that the defendants deprived Easley of some constitutional right. 42 U.S.C. § 1983. He claims that defendants placed him in administrative confinement, transferred him from DCI, and took away his "gain time" because he filed grievances and that defendants' alleged retaliatory conduct violated his right to due process under the Fourteenth Amendment and his right to freedom of expression under the First Amendment. However, there is no evidence connecting Easley's grievance to his administrative confinement, transfer, or loss of gain time.

20

Rather, the evidence establishes that Easley was placed in administrative confinement because all of the prisoners present in Section I on the day of the assault on the officer were placed in administrative confinement. Easley does not dispute that he was in Section I on the day of the assault. All of those inmates (whose whereabouts at the time of the attack could not be confirmed) were transferred from DCI. And Easley accrued no gain time for November 2011 because of an unrelated disciplinary report. Therefore, we need not address the requirements for his retaliation claim because those claims fail in any event.

## V. CONCLUSION

For the above reasons, we find no reversible error in the district court's grant of summary judgment in favor of the defendants and denial of Easley's summary judgment motion.[10]

**AFFIRMED.**

---

[10] Easley also appeals the district court's denial of his motion for appointed counsel. We review the denial of a motion for appointment of counsel for abuse of discretion. Smith v. Fla. Dep't of Corr., 713 F.3d 1059, 1063 (11th Cir. 2013). We find no such abuse of discretion, for the reasons outlined in our own denial of appointed counsel in this appeal. See Kilgo v. Ricks, 983 F.2d 189, 193 (11th Cir. 1993).